## DOOLEY v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 501.　Argued January 8, 9, 10, 11, 1901.—Decided May 27, 1901.

The Court of Claims, and the Circuit Courts, acting as such, have jurisdiction of actions for the recovery of duties illegally exacted upon merchandise, alleged not to have been imported from a foreign country.

Duties upon imports from the United States to Porto Rico, collected by the military commander and by the President as Commander-in-Chief, from the time possession was taken of the island until the ratification of the treaty of peace, were legally exacted under the war power.

As the right to exact duties upon importations from Porto Rico to New York ceased with the ratification of the treaty of peace, the correlative right to exact duties upon imports from New York to Porto Rico also ceased at the same time.

THIS was an action begun in the Circuit Court, as a Court of Claims, by the firm of Dooley, Smith & Co., engaged in trade and commerce between Porto Rico and New York, to recover back certain duties to the amount of $5374.68, exacted and paid under protest at the port of San Juan, Porto Rico, upon several consignments of merchandise imported into Porto Rico from New York between July 26, 1898, and May 1, 1900, viz.:

1. From July 26, 1898, until August 19, 1898, under the terms of the proclamation of General Miles, directing the exaction of the former Spanish and Porto Rican duties.

2. From August 19, 1898, until February 1, 1899, under the customs tariff for Porto Rico, proclaimed by order of the President.

3. From February 1, 1899, to May 1, 1900, under the amended tariff customs promulgated January 20, 1899, by order of the President.

It thus appears that the duties were collected partly before and partly after the ratification of the treaty, but in every instance prior to the taking effect of the Foraker act. The revenues thus collected were used by the military authorities for the benefit of the provisional government.

A demurrer was interposed upon the ground of the want of jurisdiction, and the insufficiency of the complaint. The Circuit Court sustained the demurrer upon the second ground, and dismissed the petition. Hence this writ of error.

*Mr. Henry M. Ward* and *Mr. John G. Carlisle* for plaintiffs in error. *Mr. William Edmond Curtis* was on *Mr. Ward's* brief. *Mr. William G. Choate* and *Mr. Joseph Larocque* filed a separate brief for plaintiffs in error.

*Mr. Solicitor General* and *Mr. Attorney General* for defendants in error.

MR. JUSTICE BROWN, after making the above statement, delivered the opinion of the court.

1. The jurisdiction of the court in this case is attacked by the government upon the ground that the Circuit Court, as a Court of Claims, cannot take cognizance of actions for the recovery of duties illegally exacted.

By an act passed March 3, 1887, to provide for the bringing of suits against the government, known as the Tucker act, 24 Stat. 505, c. 359, the Court of Claims was vested with jurisdiction over "first, all claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty, if the United States were suable;"

and by section 2 the District and Circuit Courts were given concurrent jurisdiction to a certain amount.

The first section evidently contemplates four distinct classes of cases: (1) those founded upon the Constitution or any law of Congress, with an exception of pension cases; (2) cases founded upon a regulation of an Executive Department; (3) cases of contract, express or implied, with the government; (4) actions for damages, liquidated or unliquidated, in cases *not sounding in tort*. The words "not sounding in tort" are in terms referable only to the fourth class of cases.

The exception to the jurisdiction is based upon two grounds: First, that the court has no jurisdiction of cases arising under the revenue laws; and, second, that it has no jurisdiction in actions for tort.

In support of the first proposition we are cited to the case of *Nichols* v. *United States*, 7 Wall. 122, in which it was broadly stated that "cases arising under the revenue laws are not within the jurisdiction of the Court of Claims." The action in that case was brought to recover an excess of duties paid upon certain liquors which had leaked out during the voyage, and, being thus lost, were never imported in fact into the United States. Plaintiffs paid the duties, as exacted, but made no protest, and subsequently brought suit in the Court of Claims for the overpayment. The act in force at that time gave the Court of Claims power to hear and determine "all claims founded upon any law of Congress, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the government of the United States." The court held, first, that the duties could not be recovered because they were not paid under protest, and, second, that Congress did not intend to confer upon the Court of Claims jurisdiction of cases arising under the revenue laws, inasmuch as, by the act of February 26, 1845, 5 Stat. 727, c. 22, Congress had given a right of action against the collector in favor of persons "who have paid, or shall hereafter pay, money, as and for duties, under protest . . . in order to obtain goods, wares, or merchandise imported by him or them, or on his or their account, which duties are not authorized or payable in part or in

whole by law," provided that protests were duly made in writing. It was held that this remedy was exclusive, and that Congress, after having carefully constructed a revenue system, with ample provisions to redress wrong, did not intend to give to the taxpayer and importer a different and further remedy.

Subsequent statutes, however, have so far modified that special remedy that it can no longer be made available, and the broad statement in the *Nichols* case, that revenue cases are not within the cognizance of the Court of Claims, if still true, must be accepted with material qualifications. By the Customs Administrative act of 1890, as we have just held in *De Lima* v. *Bidwell,* an appeal is given from the decision of the collector " as to the rate and amount of the duties chargeable upon imported merchandise," to a board of general appraisers, whose decision shall be final and conclusive " as to the construction of the law and the facts respecting the classification of such merchandise and the rate of duties imposed thereon under such classification," unless application be made for a review to the Circuit Court of the United States. This remedy is doubtless exclusive as applied to customs cases; but, as we then held, it has no application to actions against the collector for duties exacted upon goods which were not imported at all. Such cases, although arising under the revenue laws, are not within the purview of the Customs Administrative act; as for such cases there is still a common-law right of action against the collector, and we think also by application to the Court of Claims. There would seem to be no doubt about plaintiffs' remedy against the collector at San Juan.

In the *Nichols* case, it was held that, as there was a remedy by action against the collector, expressly provided by statute, that remedy was exclusive. In *De Lima* v. *Bidwell* we held that although no other remedy was given expressly by statute than that provided by the Customs Administrative act, there was still a common law remedy against the collector for duties exacted upon goods not imported at all; but it does not therefore follow that this remedy is exclusive, and that the importer may not avail himself of his right of action in the Court of Claims.

But conceding that the *Nichols* case does not stand in the way of a suit in the Court of Claims, the government takes the position that a suit in the United States to recover back duties illegally exacted by a collector of customs is really an action "sounding in tort," though not an action "for damages, liquidated or unliquidated," within the fourth class of cases enumerated in the Tucker act.

There are a number of authorities in this court upon that subject which require examination. The question is, whether any claim sounding in tort can be prosecuted in the Court of Claims, notwithstanding the words "not sounding in tort," in the Tucker act, are apparently limited to claims for damages, liquidated or unliquidated. The question was first considered in *Langford* v. *United States*, 101 U. S. 341, under the statute above cited, giving the Court of Claims power to hear and determine "all claims found upon any law of Congress, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the government of the United States." The suit was brought to recover for the use and occupation of certain lands and buildings of which possession had been forcibly taken by agents of the government, against the will of Langford, who claimed title to the lands. It was held that the act of the United States in taking and holding possession was an unequivocal tort, and a distinction was drawn between such a case and one where the government takes for public use lands to which it asserts no claim of title, but admits the ownership to be private or individual, in which class there arises an implied obligation to pay the owner its just value. "It is a very different matter where the government claims it is dealing with its own, and recognizes no title superior to its own. In such case the government, or the officers who seize such property, are guilty of a tort, if it be in fact private property." It was held that the limitation of the act to cases of contract, express or implied, "was established in reference to the distinction between actions arising out of contracts, as distinguished between those founded on torts, which is inherent in the essential nature of judicial remedies under all systems, and especially under the system of the common law."

The case was rested largely upon that of *Gibbons* v. *United States*, 8 Wall. 269, in which an army contractor who had agreed to furnish certain oats at a fixed price had, after the delivery of part of the amount, been released from the obligation to deliver the balance. He was, however, carried before the military authority, and, influenced by threats, agreed to deliver, and did deliver, the full quantity of oats specified in the contract. He brought suit for the difference between the contract price and the market price of the oats at the time of delivery. It was said that "if such pressure was brought to bear upon him as would make the renewal of the contract void, as being obtained by duress, then there was no contract, and the proceeding was a tort for which the officer may have been personally liable," but that it was not within the Court of Claims act.

The act of March 3, 1887, the Tucker act, was first considered by this court in *United States* v. *Jones*, 131 U. S. 1, in which it was held not to confer upon the Court of Claims jurisdiction in equity to compel the issue and entry of a patent for public land, following *United States* v. *Alire*, 6 Wall. 573, and *Bonner* v. *United States*, 9 Wall. 156. In delivering the opinion, Mr. Justice Bradley compared the original act with the Tucker act, and held that there was no such difference in language as to justify an equitable jurisdiction to compel the issue of a patent.

In *Hill* v. *United States*, 149 U. S. 593, it was held that a claim for damages for the use and occupation of land under tidewater, for the erection and maintenance of a lighthouse, without the consent of the owner, but not showing that the United States had acknowledged any right of property in him as against them, was a case sounding in tort, of which the Circuit Court had no jurisdiction under the Tucker act. It was said that "the United States cannot be sued in their own courts without their consent, and have never permitted themselves to be sued in any court for torts committed in their name by their officers. Nor can the settled distinction, in this respect, between contract and tort be evaded by framing the claim as upon an implied contract." "An action in the nature of assumpsit for

the use and occupation of real estate will never lie where there has been no relation of contract between the parties, and where the possession has been acquired and maintained under a different or adverse title, or where it is tortious and makes the defendant a trespasser." No distinction was noticed between the phraseology of the original act and the Tucker act, though it seems to have been assumed that the case was one for the recovery of "damages" sounding in tort.

In *Schillinger* v. *United States*, 155 U. S. 163, it was held that the Court of Claims had no jurisdiction of an action upon a claim against the government for the wrongful appropriation of a patent by the United States, against the protest of the patentee. It was said to be an action for damages sounding in tort, and therefore not maintainable. "Not only does the petition count upon a tort, but also the findings show a tort. That is the essential fact underlying the transaction and upon which rests every pretense of a right to recover. There was no suggestion of a waiver of the tort or a pretense of any implied contract until after the decision of the Court of Claims that it had no jurisdiction over an action to recover for the tort."

In the cases under consideration the argument is made that the money was tortiously exacted; that the alternative of payment to the collector was a seizure and sale of the merchandise for the non-payment of duties; and that it mattered not that at common law an action for money had and received would have lain against the collector to recover them back. But whether the exactions of these duties were tortious or not; whether it was within the power of the importer to waive the tort and bring suit in the Court of Claims for money had and received, as upon an implied contract of the United States to refund the money in case it was illegally exacted, we think the case is one within the first class of cases specified in the Tucker act of claims founded upon a law of Congress, namely, a revenue law, in respect to which class of cases the jurisdiction of the Court of Claims, under the Tucker act, has been repeatedly sustained.

Thus, in *United States* v. *Kaufman*, 96 U. S. 567, a brewer who had been illegally assessed for a special tax upon his busi-

ness, was held entitled to bring suit in the Court of Claims to recover back the amount, upon the ground that no special remedy had been provided for the enforcement of the payment, and consequently the general laws which govern the Court of Claims may be resorted to for relief, if any can be found applicable to such a case. This is upon the principle that a liability created by statute without a remedy may be enforced by a common-law action. The *Nichols* case was distinguished upon the ground that the statute there *had* provided a special remedy.

So, too, in *United States* v. *Savings Bank*, 104 U. S. 728, the Court of Claims was held to have jurisdiction of a suit to recover back certain taxes and penalties assessed upon a savings bank.

In *Campbell* v. *United States*, 107 U. S. 407, it was held that a party claiming to be entitled to a drawback of duties upon manufactured articles exported might, when payment thereof has been refused, maintain a suit in the Court of Claims, because the facts found raised an implied contract that the United States would refund to the importer the amount he had paid to the government. There was here no question of tort.

In *United States* v. *Great Falls Manufacturing Co.*, 112 U. S. 645, it was held, following the observation of Mr. Justice Miller in *Langford* v. *United States*, that where property to which the United States *asserts no title* is taken by their officers or agents, pursuant to an act of Congress, as private property for public use, there was an implied obligation to compensate the owner, which might be enforced by suit in the Court of Claims.

So, too, in *Hollister* v. *Benedict & Burnham Mfg. Co.*, 113 U. S. 59, it was held that a suit might be maintained in the Court of Claims to recover for the use of a patented invention, if the right of the patentee were acknowledged. To the same effect are *United States* v. *Palmer*, 128 U. S. 262, and *United States* v. *Berdan Fire-Arms Co.*, 156 U. S. 552.

In *Medbury* v. *United States*, 173 U. S. 492, it was held the Court of Claims had jurisdiction of an action to recover an excess of payment for lands within the limits of a railroad grant, which grant was, subsequent to the payment, forfeited by act of Congress for non-construction of the road.

In *Swift* v. *United States*, 111 U. S. 22, the same right was treated as existing in favor of a party who sued for a commission upon the amount of certain adhesive stamps, which he had at me time purchased for his own use from the Bureau of Internal Revenue. See also *United States* v. *Lawson*, 101 U. S. 164; *Mosby* v. *United States*, 133 U. S. 273.

2. In their legal aspect, the duties exacted in this case were of three classes: (1) the duties prescribed by General Miles under order of July 26, 1898, which merely extended the existing regulations; (2) the tariffs of August 19, 1898, and February 1, 1899, prescribed by the President as Commander-in-Chief, which continued in effect until April 11, 1899, the date of the ratification of the treaty and the cession of the island to the United States; (3) from the ratification of the treaty to May 1, 1900, when the Foraker act took effect.

There can be no doubt with respect to the first two of these classes, namely, the exaction of duties under the war power, prior to the ratification of the treaty of peace. While it is true the treaty of peace was signed December 10, 1898, it did not take effect upon individual rights, until there was an exchange of ratifications. *Haver* v. *Yaker*, 9 Wall. 32. Upon the occupation of the country by the military forces of the United States, the authority of the Spanish Government was superseded, but the necessity for a revenue did not cease. The government must be carried on, and there was no one left to administer its functions but the military forces of the United States. Money is requisite for that purpose, and money could only be raised by order of the military commander. The most natural method was by the continuation of existing duties. In adopting this method, General Miles was fully justified by the laws of war. The doctrine upon this subject is thus summed up by Halleck in his work on International Law, (vol. 2, page 444): "The right of one belligerent to occupy and govern the territory of the enemy while in its military possession, is one of the incidents of war, and flows directly from the right to conquer. We, therefore, do not look to the Constitution or political institutions of the conquerer, for authority to establish a government for the territory of the enemy in his possession, during its

military occupation, nor for the rules by which the powers of such government are regulated and limited. Such authority and such rules are derived directly from the laws of war, as established by the usage of the world, and confirmed by the writings of publicists and decisions of courts—in fine, from the law of the nations. . . . The municipal laws of a conquered territory, or the laws which regulate private rights, continue in force during military occupation, except so far as they are suspended or changed by the acts of the conqueror. . . . He, nevertheless, has all the powers of a *de facto* government, and can at his pleasure either change the existing laws or make new ones."

In *New Orleans* v. *Steamship Co.*, 20 Wall. 387, 393, it was said, with respect to the powers of the military government over the city of New Orleans after its conquest, that it had "the same power and rights in territory held by conquest as if the territory had belonged to a foreign country and had been subjugated in a foreign war. In such cases the conquering power has the right to displace the preëxisting authority, and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government. It may appoint all the necessary officers and clothe them with designated powers, larger or smaller, according to its pleasure. It may prescribe the revenues to be paid, and apply them to its own use or otherwise. It may do anything necessary to strengthen itself and weaken the enemy. There is no limit to the powers that may be exerted in such cases, save those which are found in the laws and usages of war. These principles have the sanction of all publicists who have considered the subject." See also *Thirty Hogsheads of Sugar* v. *Boyle*, 9 Cr. 191; *Fleming* v. *Page*, 9 How. 603; *American Ins. Co.* v. *Canter*, 1 Pet. 511.

But it is useless to multiply citations upon this point, since the authority to exact similar duties was fully considered and affirmed by this court in *Cross* v. *Harrison*, 16 How. 164. This case involved the validity of duties exacted by the military commander of California upon imports from foreign countries, from the date of the treaty of peace, February 3, 1848, to No-

vember 13, 1849, when the collector of customs appointed by the President entered upon the duties of his office. Prior to the treaty of peace, and from August, 1847, duties had been exacted by the military authorities, the validity of which does not seem to have been questioned. Page 189: "That war tariff, however, was abandoned as soon as the military governor had received from Washington information of the exchange and ratification of the treaty with Mexico, and duties were afterwards levied in conformity with such as Congress had imposed upon foreign merchandise imported into other ports of the United States, Upper California having been ceded by the treaty to the United States." The duties were held to have been legally exacted. Speaking of the duties exacted before the treaty of peace, Mr. Justice Wayne observed (p. 190): "No one can doubt that these orders of the President, and the action of our Army and Navy commanders in California, in conformity with them, was according to the law of arms and the right of conquest, or that they were operative until the ratification and exchange of a treaty of peace. Such would be the case upon general principles in respect to war and peace between nations." It was further held that the right to collect these duties continued from the date of the treaty up to the time when official notice of its ratification and exchange were received in California. Owing to the fact that no telegraphic communication existed at that time, the news of the ratification of this treaty did not reach California until August 7, 1848, during which time the war tariff was continued. The question does not arise in this case, as the ratifications of the treaty appear to have been known as soon as they were exchanged.

The court further held in *Cross* v. *Harrison* that the right of the military commander to exact the duties prescribed by the tariff laws of the United States continued until a collector of customs had been appointed. Said the court: "The government, of which Colonel Mason was the executive, had its origin in the lawful exercise of a belligerent right over a conquered territory. It had been instituted during the war by the command of the President of the United States. It was the government when the territory was ceded as a conquest, and it did

not cease, as a matter of course, or as a necessary consequence, of the restoration of peace. The President might have dissolved it by withdrawing the army and navy officers who administered it, but he did not do so. Congress could have put an end to it, but that was not done. The right inference from the inaction of both is, that it was meant to be continued until it had been legislatively changed. . . . We think it was continued over a ceded conquest, without any violation of the Constitution or laws of the United States, and that, until Congress legislated for it, the duties upon foreign goods, imported into San Francisco, were legally demanded and lawfully received by Mr. Harrison, the collector of the port, who received his appointment, according to instructions from Washington, from Governor Mason."

Upon this point that case differs from the one under consideration only in the particular that the duties were levied in *Cross* v. *Harrison* upon goods imported from foreign countries into California, while in the present case they were imported from New York, a port of the conquering country. This, however, is quite immaterial. The United States and Porto Rico were still foreign countries with respect to each other, and the same right which authorized us to exact duties upon merchandise imported from Porto Rico to the United States authorized the military commander in Porto Rico to exact duties upon goods imported into that island from the United States. The fact that, notwithstanding the military occupation of the United States, Porto Rico remained a foreign country within the revenue laws is established by the case of *Fleming* v. *Page*, 9 How. 603, in which we held that the capture and occupation of a Mexican port during our war with that country did not make it a part of the United States, and that it still remained a foreign country within the meaning of the revenue laws. The right to exact duties upon goods imported into Porto Rico from New York arises from the fact that New York was still a foreign country with respect to Porto Rico, and from the correlative right to exact at New York duties upon merchandise imported from that island.

3. Different considerations apply with respect to duties levied

after the ratification of the treaty and the cession of the island to the United States.   Porto Rico then ceased to be a foreign country, and, as we have just held in *De Lima* v. *Bidwell,* the right of the collector of New York to exact duties upon imports from that island ceased with the exchange of ratifications. We have no doubt, however, that, from the necessities of the case, the right to administer the government of Porto Rico continued in the military commander after the ratification of the treaty, and until further action by Congress.   *Cross* v. *Harrison,* above cited.   At the same time, while the right to administer the government continued, the conclusion of the treaty of peace and the cession of the island to the United States were not without their significance.   By that act Porto Rico ceased to be a foreign country, and the right to collect duties upon imports from that island ceased.   We think the correlative right to exact duties upon importations from New York to Porto Rico also ceased.   The spirit as well as the letter of the tariff laws admit of duties being levied by a military commander only upon importations from foreign countries; and while his power is necessarily despotic, this must be understood rather in an administrative than in a legislative sense. While in legislating for a conquered country he may disregard the laws of that country, he is not wholly above the laws of his own.   For instance, it is clear that while a military commander during the civil war was in the occupation of a Southern port, he could impose duties upon merchandise arriving from abroad, it would hardly be contended that he could also impose duties upon merchandise arriving from ports of his own country.   His power to administer would be absolute, but his power to legislate would not be without certain restrictions— in other words, they would not extend beyond the necessities of the case.   Thus in the case of *The Admittance; Jecker* v. *Montgomery,* 13 How. 498, it was held that neither the President, nor the military commander, could establish a court of prize, competent to take jurisdiction of a case of capture, whose judgments would be conclusive in other admiralty courts.   It was said that the courts established in Mexico during the war " were nothing more than agents of the military power, to as-

sist it in preserving order in the conquered territory, and to protect the inhabitants in their persons and property, while it was occupied by the American arms. They were subject to the military power, and their decisions under its control, whenever the commanding officer thought proper to interfere. They were not courts of the United States, and had no right to adjudicate upon a question of prize or no prize," although Congress, in the exercise of its general authority in relation to the national courts, would have power to validate their action. *The Grapeshot*, 9 Wall. 129, 133.

So, too, in *Mitchell* v. *Harmony*, 13 How. 115, it was held that, where the plaintiff entered Mexico during the war with that country, under a permission of the commander to trade with the enemy and under the sanction of the executive power of the United States, his property was not liable to seizure by law for such trading, and that the officer directing the seizure was liable to an action for the value of the property taken. To the same effect is *Mostyn* v. *Fabrigas*, 1 Cowp. 161.

In *Raymond* v. *Thomas*, 91 U. S. 712, a special order, by the officer in command of the forces in the State of South Carolina, annulling a decree rendered by a court of chancery in that State, was held to be void. In delivering the opinion, Mr. Justice Swayne observed: "Whether Congress could have conferred the power to do such an act is not the question we are called upon to consider. It is an unbending rule of law, that the exercise of military power, where the rights of the citizens are concerned, shall never be pushed beyond what the exigency requires."

Without questioning at all the original validity of the order imposing duties upon goods imported into Porto Rico from foreign countries, we think the proper construction of that order is, that it ceased to apply to goods imported from the United States from the moment the United States ceased to be a foreign country with respect to Porto Rico, and that until Congress otherwise constitutionally directed, such merchandise was entitled to free entry.

An unlimited power on the part of the Commander-in-Chief to exact duties upon imports from the States might have placed

Porto Rico in a most embarrassing situation. The ratification of the treaty and the cession of the island to us severed her connection with Spain, of which the island was no longer a colony, and with respect to which she had become a foreign country. The wall of the Spanish tariff was raised against her exports, the wall of the military tariff against her imports, from the mother country. She received no compensation from her new relations with the United States. If her exports, upon arriving there, were still subject to the same duties as merchandise arriving from other foreign countries, while her imports from the United States were subjected to duties prescribed by the Commander-in-Chief, she would be placed in a position of practical isolation, which could not fail to be disastrous to the business and finances of an island. It had no manufactures or markets of its own, and was dependent upon the markets of other countries for the sale of her productions of coffee, sugar and tobacco. - In our opinion the authority of the President as Commander-in-Chief to exact duties upon imports from the United States ceased with the ratification of the treaty of peace, and her right to the free entry of goods from the ports of the United States continued until Congress should constitutionally legislate upon the subject.

*The judgment of the Circuit Court is therefore reversed and the case remanded to that court for further proceedings in consonance with this opinion.*

MR. JUSTICE WHITE, (with whom concurred MR. JUSTICE GRAY, MR. JUSTICE SHIRAS and MR. JUSTICE McKENNA,) dissenting.

The question involved in this case is the validity of certain impost duties laid on goods coming from the United States into Porto Rico under the tariff imposed by the military commander and under tariffs proclaimed by the President as Commander-in-Chief. The duties collected prior to the ratification of the treaty of peace are now decided to have been valid; those collected after the ratification of the treaty are decided to have been unlawfully imposed, upon the doctrine announced in the

case of *De Lima* v. *Bidwell*, just previously decided. I concur in so far as it is held that the duties collected prior to the ratification were validly collected, but dissent in so far as it is decided that the duties collected after the ratification were illegal. I might content myself with referring to the dissent in the *De Lima* case as expressing the grounds which prevent me from concurring in this case; but the importance of the subject and the grave consequences which I think are to be entailed by the decision now announced leads me to refer to some additional considerations.

As a prelude to doing so, however, let me briefly resume the propositions which seem to me to have been hitherto established.

1. There is a *non sequitur* involved in stating that the question is whether Porto Rico was a foreign country *within the meaning of the tariff laws*, and then discussing, not the question thus stated, but a different subject, that is, whether the territory ceded by the treaty with Spain came under the sovereignty of the United States by the effect of the cession.

2. And the confusion which arises from stating one question and then analyzing and expressing opinions on another and different one, is additionally demonstrated when it is considered that most of the authorities now relied upon in relation to the extension of the sovereignty of the United States over territory were cited to the court in *Fleming* v. *Page*, to establish that the dominancy of the sovereignty of the United States over a territory was the proper test by which to determine whether, under all circumstances, the revenue laws of the United States were applicable, and the court decided adversely to such contention. *Fleming* v. *Page*, 9 How. 603.

3. As the treaty with Spain provided " that the civil rights and political *status* of the native inhabitants should be determined by Congress," in reason this provision should not be controlled by conclusions deduced from treaties made by the United States in the past with other countries which did not contain such a provision, but expressly stipulated to the contrary.

4. In view of the terms of the treaty with Spain, to hold that the *status* of the ceded territory as previously existing was *ipso facto* changed, within the meaning of the tariff laws of the

United States, without action by Congress, is to deprive that body of the rights which the stipulations of the treaty sedulously sought to preserve.

5. Even ignoring the terms of the treaty, the conclusion that the *status* of the ceded territory, within the meaning of the tariff laws, was changed by the treaty before Congress could act on the subject, can only be upheld by disregarding the opinion of the court expressed by Mr. Chief Justice Taney in *Fleming* v. *Page*, and treating the important declarations on this subject by him in that case as mere *dicta*.

6. The result also cannot be supported without a misconception of the case of *Cross* v. *Harrison*, since that decision enforced the payment of a tariff duty levied after the ratification of the treaty with Mexico at a different rate from that imposed by the existing tariff laws of the United States, and since, moreover, that case can only be harmoniously interpreted by recalling the fact that several months after the notification of the ratification of the treaty with Mexico was received in California the President ordered the tariff laws of the United States to be enforced in California, and this authority may well have been treated as not only a direction for the future, but as a ratification of the act of the military officials in enforcing the tariff laws of the United States after they had learned of the ratification of the treaty.

7. In no single case from the foundation of the government except, if it can be called an exception, in the brief period prior to the President's order enforcing the tariff laws in California, as above stated, have the revenue laws of the United States been enforced in acquired territory without the action of the President or the consent of Congress, express or implied.

8. The rule of the immediate bringing, by the self-operating force of a treaty, ceded territory inside of the line of the tariff laws of the United States denies the existence of powers which the Constitution expressly bestows, overthrows the authority conferred on Congress by the Constitution, and is impossible of execution.

Having thus imperfectly summarized the propositions which are more lucidly stated in the dissent in the *De Lima* case, I

come to express the additional thoughts which have been previously adverted to.

Before the outbreak of the war with Spain it cannot be disputed that Porto Rico was embraced within the words "foreign country," as used in the tariff laws. Why was that island so embraced without specific reference to it in such laws? is the question which naturally arises. To answer this question it is essential to determine what is the import of the words "foreign country," not internationally, but within the meaning of the tariff laws. It is settled that the power of Congress to lay an impost duty does not give the right to levy such a duty on merchandise coming from one part of the United States to the other. *Woodruff* v. *Parham*, 8 Wall. 123. It follows, therefore, that when, in the exercise of its power to lay impost duties, Congress specifies such duties are to be collected on merchandise from foreign countries, those words but generically embody the declaration of Congress that it is exerting its taxing power conformably to the Constitution; that is, it is causing the taxes which are levied to be applicable to the entire area to which they may be extended under the Constitution. The command, then, in tariff laws, that impost duties when laid shall be collected on all merchandise coming from "foreign countries," is but a provision that they are to be levied on merchandise arriving from countries which are not a part of the United States, *within the meaning of the tariff laws*, and which are hence subject to such duties. It must follow that, as long as a locality is in a position where it is subject to the power of Congress to levy an impost tariff duty on merchandise coming from that country into the United States, such country must be a foreign country *within the meaning of the tariff laws*. Now, this court has just decided in *Downes* v. *Bidwell* that, despite the treaty of cession, Porto Rico remained in a position where Congress could impose a tariff duty on goods coming from that island into the United States. If, however, it remained in that position, how then can it be now declared that it ceased to be in that relation because it was no longer foreign country within the meaning of the tariff laws? But, it is said, although when the treaty was ratified, the coun-

try at once ceased to be foreign within the meaning of the tariff laws it yet subsequently became foreign for the purpose of the tariff laws when the act of Congress imposing a duty on goods from Porto Rico took effect. To what, in reason, does this proposition come? In my opinion only to this: Congress, under the Constitution, may not impose a tariff duty on goods brought from a country which has ceased to be foreign, but, although a country has so ceased to be foreign within the meaning of the tariff laws, nevertheless Congress may thereafter cause it to become foreign within such intendment by levying an impost upon its products coming into the United States. This is but to say an act of Congress can have the effect of changing the *status* of a territory from not foreign within the meaning of the tariff laws to foreign within such meaning, although a law attempting to so do would be plainly in violation of the Constitution, if the principle announced in this case be true, that the treaty from the moment of its ratification by its own force caused the ceded territory to be no longer foreign within the meaning of the tariff laws.

The only escape my mind can point out from this deduction is to say that territory which has become domestic, and therefore ceases to be foreign within the meaning of the tariff law, can yet be constitutionally treated by Congress as if it had not ceased to be foreign and had not become domestic. But this would expressly overrule *Woodruff* v. *Parham*, 8 Wall. 123, and cannot therefore be the rule of decision now announced, since that case is referred to and cited approvingly in the opinion of my brethren who dissent in the *Downes* case, and who do not dissent from the opinion of the court now announced.

Passing these considerations, it is impossible for me to conceive that Porto Rico ceased to be subject to the tariff laws, for the reasons fully stated by me in my concurring opinion in *Downes* v. *Bidwell*, which need not be reiterated. But, for the purposes of this case and *arguendo* only, let me now admit that the treaty incorporated Porto Rico into the United States despite the provisions which were contained in that instrument. Does it follow that such territory at once ceased to be subject to the

tariff laws before Congress had the time to act? I am constrained to think not.

The power to originate revenue laws is lodged by the Constitution in the House of Representatives. When a tariff bill is drawn the revenue to arise from it must depend upon the sum of the articles which are to be imported and which are to pay the duty provided in the law. Let me illustrate it: Suppose a tariff law is so adjusted that the greater portion of the revenue which it seeks to provide is drawn from a few articles of general consumption. The duties to be paid on these articles, when imported, will, therefore, largely furnish the revenues essential to carry on the government. Suppose a treaty of cession which embraces territory producing in large quantities the articles upon which the existing tariff laws mainly rely for revenue to sustain the government. If, instantly, on the ratification of the treaty, before Congress can remodel or change the laws so as to provide for the support of the government, the articles stated coming into the United States from the country in question would be within the tariff line, and thereby entitled to free entry into the United States, what would become of the power of the House of Representatives and of the Congress on the subject of revenue as provided in the Constitution? It may be said in answer to this suggestion that Congress could make the change, and whilst of course a brief interval of disaster would ensue, during which there would be no revenue, the country must suffer the consequences during such interval. But does this follow? Suppose the political state of the country should be such that there was a difference of opinion as to the policy to be embodied in a tariff law, analogous to that which existed when California was acquired from Mexico, where, in consequence of division on the subject of the slavery question between the different branches of Congress, it was impossible to enact legislation conferring a territorial government upon California, what would be the situation then? Look at it practically from another point of view. Certainly before revenue laws can be made operative in a district or country it is essential that the situation be taken into account, for the purpose of establishing ports of entry, collection districts and the necessary

machinery to enforce them. Of course, it is patent that such investigations cannot be made prior to acquisition. But, as the laws immediately extend, without action of Congress, as the result of acquisition, it must follow that they extend, although none of the means and instrumentalities for their successful enforcement can possibly be devised until the acquisition is completed. This must be, unless it be held that there is power in the government of the United States to enter a foreign country, examine its situation and enact legislation for it before it has passed under the sovereignty of the United States. From the point of view of the United States, then, it seems to me that the doctrine of the immediate placing of the tariff laws outside the line of newly acquired territory, however extreme may be the opinion entertained of the doctrine of immediate incorporation, is inadmissible and in conflict with the Constitution.

Let me look at and illustrate it from the point of view of the ceded territory. In doing so let me take for granted the accuracy of suggestions which have been advanced in argument. It is said that the public revenues of the Island of Porto Rico, except only such as were raised by a burdensome and complicated excise tax on incomes and business vocations, had always been chiefly obtained by duties on imports and exports; that our internal revenue laws, if applied in the island, would prove oppressive and ruinous to many people and interests; that one of the staple productions of the island—coffee—had always been protected by a tariff duty, whereas under our tariff laws coffee was admitted into the United States free of duty; that there was no system of direct taxation of property in operation when the island was ceded, there was no time to establish one, and such a system, moreover, would have entailed upon the people burdens incapable of being borne. I cannot conceive that under the provisions of the Constitution conferring upon Congress the power to raise revenue that consequences such as would flow from immediately putting in force in Porto Rico the revenue laws of the United States could constitutionally be brought about without affording to the Congress the opportunity to adjust the revenue laws of the United States to meet the new situation.

All these suggestions, however, it is argued, but refer to expediency, and are entitled to no weight as against the theory that, under the Constitution, the tariff laws of the United States took effect of their own force immediately upon the cession. But this is fallacious. For, if it be demonstrated that a particular result cannot be accomplished without destroying the revenue power conferred upon Congress by the Constitution, and without annihilating the conceded authority of the government in other respects, such demonstration shows the unsoundness of the argument which magnifies the results flowing from the exercise by the treaty-making power of its authority to acquire, to the detriment and destruction of that balanced and limited government which the Constitution called into being.