Cesar **GAUTIER TORRES**, on behalf of himself and all others similarly situated, Plaintiff,

v.

David **MATHEWS**, Secretary of Health, Education and Welfare, Defendant.

Civ. No. 75–1331.

United States District Court, D. Puerto Rico.

Feb. 14, 1977.

---

Luis Amauri Suarez, Servicios Legales de Puerto Rico, Inc., Hato Rey, P.R., for plaintiff.

Julio Morales Sanchez, U.S. Atty., D. Puerto Rico, San Juan, P.R., for defendant.

Before McENTEE, Circuit Judge, TOLEDO, Chief Judge and TORRUELLA, District Judge.

## OPINION

TORRUELLA, District Judge.

Title XVI of the Social Security Act (SSA), 42 U.S.C. § 1381 et seq., also known as the Supplemental Security Income (SSI) program,[1] establishes "a national program to provide supplemental security income to individuals who . . . are . . . disabled." 42 U.S.C. § 1381. Pursuant to Section 1611(f) of the SSA, 42 U.S.C. § 1382(f), no individual is eligible for these benefits during any month in which "such individual is outside of the United States." Furthermore, the statute provides that once "an individual has been outside the United States for any period of 30 consecutive days, he shall be treated as remaining outside the United States until he has been in the United States for a period of 30 consecutive days." The term "disabled" is defined, in part, as one who "is a resident of the United States." 42 U.S.C. § 1382c(a)(1)(B). In turn, Section 1614(e) of the SSA, 42 U.S.C. § 1382c(e), defines " 'United States', when used in a geographical sense" as indicated above, as meaning the 50 States and the District of Columbia.

Plaintiff, a citizen of the United States, was found to be eligible to receive SSI benefits, due to disability, while residing in Hartford, Connecticut. During the months of September through November, 1975 he received monthly payments in the amount of $157.70.

On November 7, 1975, Plaintiff moved to San Juan, Puerto Rico. Shortly after his arrival there he visited the Social Security offices to inform this Agency of his change of address, in order to enable him to continue receiving his SSI checks. While there, Plaintiff was verbally notified by an employee of this Agency that he had rendered himself ineligible to receive further SSI benefits by reason of his change of residence to Puerto Rico. Plaintiff was instructed to immediately turn over to the Social Security Administration any SSI benefits received while he resided in Puerto Rico.

Without further ado, Plaintiff proceeded to file the present action in which he seeks to have the residency requirement set aside as contravening the due process clause of the Fifth Amendment of the Constitution of the United States. On November 26, 1975, pursuant to 28 U.S.C. § 2284(3), and

---

1. Public Law 92–603, October 30, 1972, 86 Stat.1465.

after a specific finding of irreparable injury to Plaintiff, the District Court issued a temporary restraining order against Defendant prohibiting the discontinuance of Plaintiff's SSI benefits until such time as the questions raised by this suit as decided by the Three Judge District Court convened for these purposes.

On December 19, 1975 the Social Security Administration sent Plaintiff a "Notice of Planned Action" wherein he was informed that his SSI benefits would be suspended effective December 1, 1975. This Notice also advised Plaintiff of his appeal rights. In compliance with the Court's outstanding temporary restraining order, the Notice stated that Plaintiff would continue to receive his SSI benefits while the order remained in effect.

On January 19, 1976 Plaintiff proceeded to file with the Administration a "Request for Reconsideration of the Notice of Planned Action." On February 20, 1976 this Request was denied. As grounds for this action, it was stated: "Although you meet all other factors of eligibility, you do not meet the residence requirements. To be eligible for Supplemental Security Income checks, you must live in one of the 50 States or Washington D.C."

After several preliminary procedural interchanges the Administration has affirmed its decision as final for purposes of 42 U.S.C. § 405(g), thus concluding that no further exhaustion of administrative remedies is necessary. See *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); 20 CFR 416.1424c.

Plaintiff contends that the exclusion from SSI benefits of a citizen of the United States for the sole reason of his change in residence to Puerto Rico, is repugnant to the Fifth Amendment of the Constitution of the United States in that it establishes an irrational and arbitrary classification violative of the equal protection component of the due process clause of said Constitutional provision. As alternative grounds Plaintiff further contends that the statute in question infringes upon his constitutional right to travel and freedom of movement in that it forces him, in order to qualify for these benefits (which to him are essential), to remain within the 50 States and the District of Columbia.

Defendant replies that this legislation constitutes a valid exercise by Congress of its plenary powers pursuant to the territorial clause of Article IV, Section 3 of the Constitution, and that no arbitrary classification is created by the Statute in question. Relying upon the so-called *Insular Cases*,[2] Defendant claims that "[t]he equal protection component of the due process clause of the Fifth Amendment of the Constitution does not require Congress to afford the Commonwealth of Puerto Rico the same treatment under the scope of its enactments as though it were a state."

This last contention is the starting point for the resolution of the questions raised by this case.

The *Insular Cases*, which where the product of acquisition by the United States of various non-contiguous territories after the termination of the Spanish-American War, resolved the issue of whether the Constitution "follows the flag." After much debate,[3] the Court in *Balzac v. Porto Rico*, 258

**2.** *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922).

**3.** For some contemporary legal thinking, see Baldwin, *The Constitutional Questions Incident to the Acquisition Government by the United States of Island Territory*, 12 Harv.L.Rev. 393

(1899); Lowell, *The Status of Our New Possessions—A Third View*, 13 Harv.L.Rev. 155 (1899); Palfrey, *The Growth of the Idea of Annexation, and Its Breaking Upon Constitutional*, 13 Harv.L.Rev. 371 (1899); Randolf, *Constitutional Aspects of Annexation*, 12 Harv. L.Rev. 291 (1899); Longdell, *The Status of Our New Territories*, 12 Harv.L.Rev. 364 (1899). A later article also contains some interesting views on this subject, Coudert, *The Evolution of the Doctrine of Territorial Incorporation*, 26 Col.L.Rev. 823 (1926).

U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), created[4] the doctrine of incorporated versus unincorporated territories whereby in the later case (that is, territories for which Congress had not expressed an intention of eventual Statehood) only "certain fundamental personal rights declared in the Constitution" were held to be in effect within its geographical confines. (258 U.S. at

pages 312–313, 42 S.Ct. at page 348). In *Balzac,* a criminal slander prosecution for published "reflections" on the then Governor of Puerto Rico, the Court held that Puerto Rico was an unincorporated Territory. Therefore, the Court concluded, there did not exist a Sixth Amendment right to trial by jury, because such a trial was not a "fundamental" right.[5]

**4.** This process was recently described as follows in *Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976), at footnote 30 of pages 599–600, of page 2280 of 96 S.Ct.:

"The division of opinion in the Congress over how, and to what extent, the Constitution applied to Puerto Rico was reflected in the Court's opinions in *Downes.* Mr. Justice Brown believed that the question was whether Congress had extended the Constitution to Puerto Rico; Mr. Justice White, with whom Justices McKenna and Shiras joined, propounded the theory of incorporated and unincorporated territories, and Mr. Justice Gray was of the opinion that the question was essentially a political one to be left to the political branches of government. The Chief Justice, with whom Justices Harlan, Brewer, and Peckham joined, dissented on the ground that the Constitution applied to Puerto Rico *ex proprio vigore.* Mr. Justice White's approach in *Downes v. Bidwell* was eventually adopted by a unanimous Court in *Balzac v. Porto Rico.*"

For a more jocular description of this process see "Mr. Dooley at His Best" (1938), F. Dunne, also reported in a note entitled *Inventive Statesmanship v. The Territorial Clause: The Constitutionality of Agreements Limiting Territorial Powers,* 60 Va.L.Rev. 1041, 1063 (1974).

**5.** Interestingly enough the Supreme Court has since then held that the right to trial by jury is "*fundamental* to the American scheme of justice." *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1967) (emphasis supplied); *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1969). Furthermore, it is unlikely that the offense for which Balzac was sentenced to five months imprisonment would be held to be a triable offense under current Supreme Court reasoning. Cf. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1954); *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Ashton v. Kentucky,* 389 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).

Since the *Insular Cases,* the Supreme Court has significantly advanced the equality of rights for other cognizable minority citizens of the United States, by striking down similar judge-made distinctions bearing on the rights

of such citizens (Cf. *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) and *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

Expectations for the imminent demise of the *Insular Cases* were raised by the decisions in *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1956), *Kinsella v. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), *Grisham v. Hagan,* 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960), and *McElroy v. Guagliardo,* 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960), all dealing, in different variations, with the application of the Constitution to civilians who accompany the Armed Forces overseas in time of peace. In commenting directly upon the *Insular Cases* the Court said in *Reid v. Covert,* supra:

"This Court and other federal courts have held or asserted that various constitutional limitations apply to the Government when it acts outside the continental United States. While it has been suggested that only those constitutional rights which are 'fundamental' protect Americans abroad, we can find no warrant, in logic or otherwise, for picking and choosing among the remarkable collection of 'Thou shalt nots' which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments  .   .   ." (354 U.S. at pages 8–9, 77 S.Ct. at page 1226).

The Court went on to say:

"The 'Insular Cases' can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations to govern *temporarily* territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship. Moreover, it is our judgment that *neither the cases nor their reasoning should be given any further expansion.* The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our Government. .   .   ." (354 U.S. at page 14, 77 S.Ct. at page 1228; emphasis supplied).

Unfortunately, there are recent indications that the Court has not yet seen fit to lay the

Defendant's reliance on the *Insular Cases,* however, is the product of a misconception as to the issues before us. We are not here concerned with the alleged power of Congress to establish disparate treatment towards the United States citizens who reside in Puerto Rico. Rather, the focus of our attention should be directed to determining whether a constitutional right of a citizen of the United States has been improperly penalized *while he is within one of these States.* We see this as the more relevant framing of the issues because although Plaintiff lost his benefits while physically in Puerto Rico, the statutory prohibitions that permitted this result came into play from the very moment when they exerted their force upon Plaintiff. From this standpoint, Plaintiff is in the same position now as if he would have remained in Connecticut and brought a declaratory judgment suit there to challenge the validity of the sections at issue, in compliance with the requirements of the Declaratory Judgment Act, 28 U.S.C., Sections 2201, 2202. See *Public Service Commission of Utah v. Wycoff Co.,* 344 U.S. 237, 242–244, 73 S.Ct. 236, 97 L.Ed. 291 (1952); *Golden v. Zwickler,* 394 U.S. 103, 108–11, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

It is now beyond question that the right to travel and to freedom of movement, particularly within the United States, are fundamental rights of all citizens of the United States, *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 254, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Shapiro v. Thompson,* 394 U.S. 618, 629–633, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

In *United States v. Guest,* 383 U.S. 745, 757–758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), the Court said:

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized.

" . . . [T]hat right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution."

See also *Kent v. Dulles,* 357 U.S. 116, 125–127, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1957). Cf. *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

*Shapiro v. Thompson,* supra, is particularly relevant. That case involved constitutional challenges to statutory provisions of Connecticut, Pennsylvania and the District of Columbia which required one year's residence as a prerequisite to welfare eligibility. Appellants' principal contentions were to the effect that the waiting period was needed to preserve the fiscal integrity of public assistance program and as a permissible attempt to discourage indigents from entering a State solely to obtain larger benefits. The Court stated, at 394 U.S. page 634, 89 S.Ct. at page 1331:

" . . . [I]n moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest is unconstitutional."

Pursuant to the Equal Protection Clause of the Fourteenth Amendment, the Court struck down the state statutes as failing to meet this standard. The Court further decided:

"The waiting-period requirement in the District of Columbia Code . . . is also unconstitutional even though it was adopted by Congress as an exercise of federal power. In terms of federal power, the discrimination created by the one-year requirement violates the Due Proc-

cadaver of the *Insular Cases* to rest. The aforecited case of *Examining Board v. Flores de Otero,* supra, may very well have given new

warmth to this otherwise moribund corpse. (See pages 599–602 of 426 U.S., 96 S.Ct. 2264).

ess Clause of the Fifth Amendment. '[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is "so unjustifiable as to be violative of due process." ' . . . For the reasons we have stated in invalidating the Pennsylvania and Connecticut provisions, the District of Columbia provisions is also invalid—the Due Process Clause of the Fifth Amendment prohibits Congress from denying public assistance to poor persons otherwise eligible solely on the ground that they have not been residents of the District of Columbia for one year at the time their applications are filed." (394 U.S. at pages 641–642, 89 S.Ct. at page 1335).

■ Considering the fundamental nature of the right to travel, we can perceive of no reason why the standards which restrictive legislation must meet are not applicable with equal vigor to any impingement upon travel *from,* as distinguished from travel to a State. *Kent v. Dulles,* supra. Cf. *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Furthermore, if we view these principles in the light of the application to Plaintiff of the sections of the Statute in question, it is vividly apparent that such provisions have restricting, inhibiting, chilling and penalizing effects upon Plaintiff's exercise of a fundamental constitutional right, and can survive our scrutiny only if there is a compelling governmental interest that will justify such treatment. *Memorial Hospital v. Maricopa County,* supra, 415 U.S. at pages 253–262, 94 S.Ct. 1076; *Shapiro v. Thompson,* supra, 394 U.S. at page 631, 89 S.Ct. 1322; *Cole v. Housing Authority of City of Newport,* 435 F.2d 807 (C.A.1, 1970).

Our search for a "compelling governmental interest" within the Medusa-like legislative history of Public Law No. 92–603 resembles the proverbial quest for the needle in the haystack. See 1972 U.S.Code Congressional and Administrative News, Vol. 3, pp. 4989–5400.

As originally envisioned in H.R. 1, one of the principal purposes of the SSI provisions was the establishment of "uniform treatment of recipients under the Federal-State public assistance program" (*id.,* p. 4989), to thus have "nationally uniform requirements for such eligibility factors as the level and type of resources allowed." Id. p. 4992. In consonance with this goal H.R. 1, included Puerto Rico (as well as Guam and the Virgin Islands) within the SSI program. Id. pp. 5013, 5324, 5350.[6] However, the benefits for these jurisdictions were "adjusted by the ratio of the per capita income of each of these locales, to the per capita income of the lowest of the 50 States." Id., pp. 5022, 5320, 5349–5350.

There were misgivings expressed to H.R. 1 by several Congressmen. In a document entitled "Additional Views of Hon. Hugh L. Carey, Hon. Charles A. Vanik, Hon. William J. Green, and Hon. James C. Corman on H.R. 1." (Id., pp. 5362–5367), the following statements were made:

"We are concerned with the provisions which would permit states to reinstitute residence requirements of up to one year. Population stability is assured by equal opportunity for employment and for those in need by a national welfare system paying adequate benefits, rather than through the establishment of interstate barriers to the mobility of the poor in exactly the way which the Supreme Court prohibited in *Shapiro v. Thompson,* 394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 600].

.    .    .    .    .

We recognize that the Committee action moves in the direction of more equitable treatment of the Commonwealth of Puerto Rico and other insular areas. This is evidenced by the change in benefit level for a family of four from $636 to $1,320. This figure, however, is considerably below the federal minimum standard of $2,400. We recognize that this is an involved and complicated question. We

**6.** Section 2014(e) of H.R. 1 specifically included Puerto Rico within the definition of the term "United States." Id., p. 5324.

recognize that the relationship between income level in Puerto Rico and state public assistance benefits presents a problem and that this problem has been negotiated by the Administration AND THE Commonwealth government and those in the Department of Health, Education and Welfare.

The problem remains that as long as States such as New York, Pennsylvania, Massachusetts, Ohio, etc. have a more attractive level of benefits, there is an incentive to migrate to those areas from the Commonwealth and other insular areas at a time when unemployment is a problem both in the area of origin and in the area of destination. With this in mind, the Department, which is undertaking the administration of the program in insular areas and in the States, should be prepared to accept a new responsibility. The Department should initiate such positive programs as are required to improve opportunities for employment through training and bring about a better system of benefits through work programs than has been in effect heretofore.

*It is not our intent to state that any such program be designed to impede or deter citizens from moving freely in search of employment.* Rather, we want to make sure that a decision would be made on the grounds of self-improvement; not due to pure economic differential in welfare.

We are pleased the Secretary has agreed, therefore to implement these programs which would benefit the citizens of Puerto Rico and other insular areas as well as all the other citizens of the United

States found to be eligible and in need." (Emphasis supplied).

For reasons that are to our viewpoint, unclear, the Senate completely eliminated Puerto Rico from SSI coverage, thus relegating it to treatment under the then existing Federal-State programs. 42 U.S.C. §§ 301, 1201, 1351.

In its brief the Government asserts "[t]he cost factor and the effect of the extension of SSI benefits to Puerto Rico" as the rational basis for Congressional action. It does not discuss the issue of compelling state interest separately and we thus assume that it considers its assertions as to rational basis and compelling state interest to be closely akin. We take the substance of the Government's argument to mean that if SSI benefits were to apply to residents of Puerto Rico to the same extent as to those of the 50 States and the District of Columbia, that the total cost of the program would be higher, and that the benefits paid to Puerto Rican residents, when compared to the local per capita income, could have a deleterious effect upon the character of Puerto Rican welfare recipients.[7]

Even accepting these statements at face value, we fail to see how those factors have any connection with the facts presented by this case. Here we have a United States citizen who resides in one of the States and starts receiving SSI benefits while there. His qualifying for the receipt of these benefits while in Connecticut, and his continued receipt of the same, can have no bearing on any added cost that may be incurred by giving these benefits to the residents of

---

**7.** In its brief, the Government quotes the following statements made before the Senate Committee on Finance on H.R. 1 (in hearing held July 27, 29, August 2, 3, 1971, page 95), as "principal evidence of Congressional intent in removing coverage for Puerto Rico from this provision":

"In fact, a comment from a very high official from Puerto Rico early this year was that 'we do not want any part of this, because if you put 33.7 percent of the people in Puerto Rico in category of being eligible for welfare, it will ruin the character of our people."

If this be evidence of Congressional intent, it is weak evidence indeed, particularly when, as is recognized by the Government in its brief, and as is readily apparent from the quoted statement itself, the statement is inapplicable to SSI but rather deals with H.R. 1 in general. The granting of increased benefits to the blind, incapacitated, and those aged over 65 in Puerto Rico can hardly place 33.7% of the Puerto Rican population in a position of claiming SSI benefits.

Puerto Rico, which is not at issue here. Similarly, there can be no logical connection between such a situation and the import upon Puerto Rican welfare recipients. Although it can be argued that the higher Stateside benefits would encourage migration for the purpose of qualifying for SSI, not only is there an absence of proof that the reasoning behind the geographic limitations is to discourage such internal migration, but if such were *sub silentio* the rationale, it would be a clearly impermissible compelling state interest. *Memorial Hospital v. Maricopa County,* supra, 415 U.S. at pages 263–264, 94 S.Ct. 1076; *Shapiro v. Thompson,* supra, 394 U.S. at pages 631, 641–642, 89 S.Ct. 1322.

The above leads us to the forceful conclusion that, under the facts of this case, there is a lack of such compelling state interest as to justify penalizing Plaintiff's right to travel. We therefore conclude that Section 1611(f) and Section 1614(e) of the SSA are unconstitutional as applied to Plaintiff.

In reaching this result we are not unaware of the possibility that, if the Social Security Act remains in its present form, we may be opening the door to certain undesirable practices. This is inevitable when dealing with this type of legislation, and of course, we can not presume that such actions will be those of the large majority of citizens. In any event, such contingencies are the proper subject of corrective legislative and regulatory endeavor and should not be determinative of the issues here presented.

The Clerk shall enter Judgment in accordance with this Opinion.

McENTEE, Senior Circuit Judge (dissenting).

While I have great respect for the scholarly nature of the majority's opinion and while I am sympathetic to the policy considerations which it reflects, I am unable to agree with the majority as to the significance of the legal principles at issue. Accordingly, I must dissent.

In my view, what is basically at issue here is the Congressional decision that SSI benefits are to be unavailable to anyone not located in one of the fifty states or the District of Columbia. 42 U.S.C. § 1381 *et seq.* This I consider to be the real issue, rather than a citizen's right to travel.

Given the unique relationship between the Commonwealth of Puerto Rico and the United States, *see Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Fornaris v. Ridge Tool Co.,* 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970),[1] I do not believe that Congress is *required* to extend any one particular financial benefit to those located in the Commonwealth.[2] While I might well have voted to extend SSI benefits to Puerto Rico had I been a member of the legislative branch, as a judge I am unable to perceive any mandate—constitutional or otherwise—that this must be done.

As for the majority's argument based on the right to travel, I would simply state that I have found no case which extends the rationale of *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)[3] to

---

**1.** *See also* 48 U.S.C. § 731 *et seq.; Caribtow Corp. v. OSHRC,* 493 F.2d 1064 (1st Cir. 1974) and cases cited. *See generally* de Passalacqua, The Constitutional and Political Status of the Island of Puerto Rico, 10 Rev. de Derecho Puertorriqueno 11 (1970); Leibowitz, The Applicability of Federal Law to the Commonwealth of Puerto Rico, 56 Geo.L.J. 219 (1967); Magruder, The Commonwealth Status of Puerto Rico, 15 U.Pitt.L.Rev. 1 (1953).

**2.** Nor in fact has Congress done so historically. *See* Leibowitz, *supra* note 1, at 269–70.

It should be noted that the unicity of Puerto Rico's relationship to the United States does

not always work to the island's disadvantage. In the tax area, for example, Puerto Rico is the beneficiary of certain quite favorable legislative provisions. *See, e. g.,* 26 U.S.C. §§ 933, 7653. *See also* Hector, Puerto Rico: Colony or Commonwealth?, 6 N.Y.U.J.Int'l L. & Pol. 115, 135 & nn.110 & 112 (1973).

**3.** *See also Memorial Hospital v. Maricopa County,* 415 U.S. 250, 254–55 & nn.7–8, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). *See generally* Comment, A Strict Scrutiny of the Right to Travel, 22 U.C.L. A.L.Rev. 1129 (1975).

travel other than between two or more of the fifty States or the District of Columbia. And I do not believe that the present status of the complex relationship between Puerto Rico and the United States constitutes an adequate predicate for a judicial extension of that rationale to the instant case.

I recognize that this case raises very important issues, and I am deeply impressed by the cogency with which the majority articulates its position. Nevertheless, for the reasons stated, I am unable to subscribe to their views, and I respectfully dissent.