DE PASS et al. v. BIDWELL, Collector.

(Circuit Court, S. D. New York. August 14, 1903.)

1. CUSTOMS DUTIES—IMPORTATIONS FROM PORTO RICO—FORAKER ACT.
   Section 5 of the Foraker act, providing a temporary government and revenues for Porto Rico (Act April 12, 1900, c. 191, 31 Stat. 77), which provides that on and after the day of its taking effect all goods, wares, and merchandise previously imported from Porto Rico, for which no entry has been made, or entered without payment of duty, and under bond for warehousing, etc., shall be subject to the duties imposed by the act upon the entry or withdrawal thereof, is constitutional; and goods brought from Porto Rico after its cession, and when there was no duty thereon in force, and voluntarily placed and allowed to remain in a bonded warehouse by the owner until after such act went into effect, became subject to the duty thereby imposed when withdrawn for consumption.

2. CONSTITUTIONAL LAW—EX POST FACTO LAWS.
   The constitutional prohibition against ex post facto laws applies only to criminal or penal statutes.

This action is brought against George R. Bidwell to recover the sum of $2,500.97, with interest on various amounts thereof from the times they were paid, and which sums, it is claimed, were illegally collected by the defendant from the plaintiffs as duties on certain su-

¶ 2. See Constitutional Law, vol. 10, Cent. Dig. § 551.

gars brought from the island of Porto Rico to the United States, and which sugars were received at the port of New York June 24, 1899.

John David Lannon, for plaintiffs.

Henry L. Burnett, U. S. Atty., and Henry C. Platt, Asst. U. S. Atty., for defendant.

RAY, District Judge.    The vessel Lilian Woodruff sailed from the port of Areceibo, Porto Rico, June 12, 1899, and arrived at the port of New York, U. S. A., June 24, 1899.   She brought as part of her cargo certain sugars consigned to A. S. Lascelles & Co., the plaintiffs. When the vessel arrived at New York, the sugars were put in bonded warehouses; the warehouse's entry being No. 101,121, and the bond No. 54,386.   The entry was liquidated November 14, 1899, and duties assessed, it is asserted, under the provisions of the Dingley tariff act (Act July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]). June 6, 1900, the entry was reliquidated, and duties were reassessed under the provisions of the Porto Rican act, commonly known as the "Foraker Bill" (Act April 12, 1900, 31 Stat. 77, c. 191).   Due protest was made against the imposition of any and all duties.   These sugars were withdrawn from time to time, and duties paid thereon as follows:   About June 30, 1900, the sum of $332.99; about August 2, 1900, the sum of $2,166.79; about August 8, 1900, the sum of $1.19. George R. Bidwell was collector of the port of New York at all the times mentioned.

The allegations of the complaint, so far as material here, are as follows:

"First. That at all the times hereinafter mentioned the said defendant was the duly appointed and commissioned collector of customs of the United States at the port of New York, in the actual and unrestricted exercise of his functions as such collector, and fully vested with all the powers and authority of his said office.

"Second. That the defendant, being such collector as aforesaid, did, under color of his said office, and through the erroneous exercise of the powers and authority in him vested for the performance of his duties as such collector, unlawfully demand, and by duress of goods collect, from the said plaintiffs, said firm of A. S. Lascelles & Co., as alleged duties upon certain sugars, the product of the island of Porto Rico, consigned to these plaintiffs at the port of New York, and brought thither from the port of Areceibo, in the said island, by the vessel Lilian Woodruff, which said vessel sailed from the said port of Areceibo at or about June 12, 1899, and arrived at the port of New York at or about June 24, 1899 (the said sugars being those mentioned and described in warehouse entry No. 101,121, bond No. 54,386, liquidated November 14, 1899, reliquidated June 6, 1900), the sum of twenty-five hundred dollars and ninety-seven cents ($2,500.97).   The said sum was exacted from these plaintiffs in the amounts and at the times following:   On or about June 30, 1900, the sum of three hundred thirty-two dollars and ninety-nine cents ($332.99); on or about August 2, 1900, the sum of two thousand one hundred sixty-six dollars and seventy-nine cents ($2,166.79); on or about August 8, 1900, the sum of one dollar and nineteen cents ($1.19)—which sum plaintiffs were unlawfully and against their will, and in spite of their formal protest, duly made, and compelled to pay, and did pay, in order to obtain possession of the said sugars, to which they were entitled, but which he, enabled so to do by the power and authority of his said office, had detained, was detaining, and threatened to continue to detain from them, exacting as a condition of the delivery thereof such payment of said alleged duties, whereas the said sugars were not liable to duty, the same not having

been imported from any foreign country, within the meaning of any valid statute or executive order of the United States, but were merchandise which must, under and by virtue of the provisions of the Constitution of the United States in that regard, be admitted to free entry in any port of the United States."

To this complaint the defendant demurs on the following grounds:

"That said complaint does not state facts sufficient to constitute a cause of action against the defendant. That said goods were lawfully dutiable under the provisions of section 5 of the act of April 12, 1900, c. 191, 31 Stat. 77, entitled 'an act temporarily to provide revenues and a civil government for Porto Rico and for other purposes.'"

The plaintiff contends that these sugars were entitled to free entry at the time of their arrival at the port of New York; that they were liable to American duties when imported, or not at all; that they were not lawfully dutiable under the provisions of section 5 of the act of April 12, 1900, entitled "An act temporarily to provide revenues and a civil government for Porto Rico and for other purposes," and which act went into effect May 1, 1900, and contained, among others, the following provisions:

"Sec. 3. That on and after the passage of this act all merchandise coming into the United States from Porto Rico and coming into Porto Rico from the United States shall be entered at the several ports of entry upon payment of fifteen per centum of the duties which are required to be levied, collected and paid upon like articles of merchandise imported from foreign countries; and in addition thereto, upon articles of merchandise from Porto Rican manufacture coming into the United States and withdrawn for consumption or sale upon payment of a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture; such tax to be paid by internal revenue stamp or stamps to be purchased and provided by the Commissioner of Internal Revenue and to be procured from the collector of internal revenue at or most convenient to the port of entry of said merchandise in the United States, and to be affixed under such regulations as the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury shall prescribe; and on all articles of merchandise of United States manufacture coming into Porto Rico in addition to the duty above provided upon payment of a tax equal in rate and amount to the internal revenue tax imposed in Porto Rico upon the like articles of Porto Rican manufacture: provided, that on and after the date when this act shall take effect, all merchandise and articles except coffee, not dutiable under the tariff laws of the United States, and all merchandise and articles entered in Porto Rico free of duty under order heretofore made by the Secretary of War, shall be admitted into the several ports thereof, when imported from the United States, free of duty, all laws or parts of laws to the contrary notwithstanding; and whenever the Legislative Assembly of Porto Rico shall have enacted and put into operation a system of local taxation to meet the necessities of the government of Porto Rico by this act established, and shall by resolution duly passed so notify the President, he shall make proclamation thereof, and thereupon all tariff duties on merchandise and articles going into Porto Rico from the United States or coming into the United States from Porto Rico shall cease, and from and after such date all such merchandise and articles shall be entered at the several ports of entry free of duty; and in no event shall any duties be collected after the first day of March, nineteen hundred and two, on merchandise and articles going into Porto Rico from the United States, or coming into the United States from Porto Rico."

"Sec. 5. That on and after the day when this act shall go into effect all goods, wares and merchandise previously imported from Porto Rico, for which no entry has been made, and all goods, wares and merchandise previously entered without payment of duty and under bond for warehousing,

transportation or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed by this act, and to no other duty, upon the entry or the withdrawal thereof; provided, that when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse said duties shall be levied and collected upon the weight of such merchandise at the time of its entry."

The plaintiff contends that this action will lie against Bidwell, because the gist of the action is the unlawful detention, and that this is true irrespective of whether, under the circumstances of the case, the Foraker bill applied. The plaintiff further contends that if section 5 of the Foraker bill, by its terms, does impose a duty on these goods, then the said tax is unconstitutional, inasmuch as it lacks uniformity, and also contends broadly that section 5 of the Foraker bill is unconstitutional, being in effect an ex post facto law.

The case seems to present these questions: First. Does the complaint charge that prior to April 12, 1900, when the Foraker act was passed, or prior to May 1, 1900, when that act took effect, the defendant unlawfully seized or held or detained the sugars in question? Second. Is not the charge in the complaint solely that these sugars were illegally detained, etc., by the imposition of duties under the Foraker act in June and August, 1900, rather than in November, 1899? Third. Does the complaint charge an illegal detention, etc., both in 1900 and 1899?

If, on the arrival of these sugars at the port of New York in June, 1899, the plaintiff voluntarily placed them in bonded warehouse, and there allowed them to remain until the Foraker act was passed and took effect, then the only question is, was the act of the defendant, as collector of the port, in holding the merchandise for the payment of duties assessed under that act, illegal? In other words, is the Foraker act constitutional, wherein it, in terms, authorized the imposition of the duties actually paid, assuming that the goods were voluntarily placed and allowed to remain in bond until that time? If, however, these sugars were voluntarily placed in bond by the importer, and a duty was imposed thereon under the Dingley tariff act, and they were held for the payment of such duties until the Foraker act took effect, such holding and detention were illegal, for the Supreme Court of the United States has held that goods brought into the United States from Porto Rico after that territory became the property of the United States, and before its organization, and before the enactment of the Foraker law, and not placed in bond, were not subject to the payment of any duty. As there was no tariff law applicable until the Foraker act became a law, inasmuch as Porto Rico had ceased to be a foreign country, and Congress had not acted and passed a law imposing duties on merchandise imported from that territory, it cannot reasonably be claimed that the collector had the right to impose a duty under the Dingley tariff act, and hold the merchandise for the payment of such duties until the Foraker act went into operation, and then impose duties under that law, and claim protection under the provisions of section 5 of that act; that is, under the provision "and all goods, wares and merchandise previously entered without payment of duty and under bond for warehousing, trans-

portation or other purposes for which," etc. This court is of the opinion that the plaintiffs do not charge an illegal detention of these goods, or an unlawful demand, etc., prior to the imposition of duties under the Foraker act; that, so far as appears, the plaintiffs voluntarily elected to make a warehouse entry, and the only compulsion or exaction complained of on the face of the complaint is the payment of the duties when the plaintiffs withdrew the goods in June and August, 1900. No protest is alleged against making any particular entry of said goods on June 24, 1899, on their arrival at the port of New York. The complaint says that the defendant "did, under color of his said office, * * * unlawfully demand, and by duress of goods collect, from the said plaintiffs, * * * as alleged duties upon certain sugars, the product of the island of Porto Rico * * * [here follows a description of the sugars, and of the time of their arrival, etc.], the sum of twenty-five hundred dollars and ninety-seven cents ($2,500.97). The said sum was exacted, * * * which sum plaintiffs were unlawfully, and against their will, and in spite of their formal protest, duly made and compelled to pay, and did pay, in order to obtain possession of the said sugars," etc. The complaint charges that the duties exacted were demanded and paid in June and August, 1900, at which time, as they were in bonded warehouse, they were, so far as appears from any fact stated in the complaint, subject to duty under the provisions of the Foraker act, and to the rates imposed by that act; and there is no charge that the sums exacted and paid were exacted or demanded under the provisions of the Dingley tariff act. In the absence of such allegations, it must be assumed that the complaint charges, and was intended to charge, that these duties demanded and paid were levied under the provisions of the Foraker act, and not under the provisions of the Dingley act. This being so, the only question is, is the Foraker act constitutional, wherein it provides that goods, imported from Porto Rico before the passage of the Foraker act, but remaining in bonded warehouse after the passage of that act, are subject to the duties imposed by that act?

Porto Rico ceased to be a foreign country on the 11th day of April, 1899, on which day the ratifications of the treaty of peace between the kingdom of Spain and the United States were exchanged, and the treaty proclaimed. This fact has been recognized by the Supreme Court of the United States in Dooley v. U. S., 182 U. S. 222, 230, 21 Sup. Ct. 762, 45 L. Ed. 1074; and also this fact was recognized by the Congress of the United States, in section 3, c. 1, Acts 1900, c. 191, § 8, 31 Stat. 79, of the act entitled "An act to provide a government for the territory of Porto Rico," wherein it is declared that the treaty of peace was ratified April 11, 1899. It has been settled by the Supreme Court of the United States that Congress had power to enact the so-called Foraker law, and to impose duties on goods, wares, and merchandise brought into the United States from Porto Rico after that island ceased to be a foreign country. Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088. In that case it was decided:

"The imposition of duties upon imports from Porto Rico by the act of Congress known as the 'Foraker Act,' approved April 12, 1900 (31 Stat.

77, c. 191), temporarily providing a civil government and revenues for that island, was a constitutional exercise of the power of Congress. Article 4, § 3, of the Constitution, vests Congress with the power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States. The island of Porto Rico, by the treaty of cession, became territory appurtenant to the United States, but not a part of the United States, within the revenue clauses of the Constitution, such as article 1, § 8, requiring duties, imports, and excises to be uniform 'throughout the United States.' We are therefore of opinion that the island of Porto Rico is a territory appurtenant to the United States, within the revenue clauses of the Constitution; that the Foraker act is constitutional, so far as it imposes duties upon imports from such island; and that the plaintiff cannot recover back the duties exacted in this case."

Section 20 of the customs administrative act of June 10, 1890, c. 407, 26 Stat. 140 [U. S. Comp. St. 1901, p. 1950], provides that "any merchandise deposited in any public or private bonded warehouse, may be withdrawn for consumption within three (3) years from the date of original importation on payment of the duties and charges to which it may be subject, by law, at the time of such withdrawal." At the time the sugars in question were entered and put in bond by the owner, they were not subject to duty, as the Foraker act was not a law, and the Dingley tariff law had ceased to be operative. The importer, however, did not see fit to enter these goods for consumption at that time, and place them upon the market, but, so far as appears, voluntarily placed them in government custody by making a warehouse entry and allowing them to remain. While it is true that this sugar was imported on or about June 24, 1899, such importation was not complete and did not become a closed transaction so long as the goods remained in the custody of the officers of the customs. Until withdrawn from bond and delivered to the importer, whether on shipboard or in warehouse, they were subject to any duties which Congress saw fit to impose. While in this condition the goods were being imported, and became subject to such new legislation in respect to duties and in respect to warehouse laws as Congress saw fit to enact. The goods were in the possession of the government, left there voluntarily, and properly were the subject of new legislation. For duty purposes, not having been delivered to the importer until after the passage of the Foraker act, they are to be regarded and treated the same as though they had actually arrived at the port of New York after the enactment of that law. U. S. v. McGrath (D. C.) 50 Fed. 404; U. S. v. Goodsell Co., 84 Fed. 439, 28 C. C. A. 453; Oppenheimer v. U. S. (C. C.) 90 Fed. 796; Fabbri v. Murphy, 95 U. S. 191, 24 L. Ed. 468.

In Oppenheimer v. U. S. (C. C.) 90 Fed. 796, the court followed the Circuit Court of Appeals in U. S. v. Goodsell, 84 Fed. 439, 28 C. C. A. 453, and held that where goods were entered on August 27, 1894, but remained in the custody of the government on the 28th of that month, they must be treated as imported on the 28th.

In U. S. v. Goodsell Co., supra, the Circuit Court of Appeals in the Second Circuit held:

"The act of August 28, 1894, c. 349, 28 Stat. 509, provides that, unless otherwise specially provided, there shall be levied upon all articles 'imported from foreign countries or withdrawn for consumption' the rates of

duty therein prescribed. An importation of lemons was entered a few days before the passage of the act, and, according to custom and the rules of administration of the port, were designated for examination on the wharf. On August 29th the goods were examined there, having remained in the custody of the government up to that time, and were then sold by the importers. Held, that they were dutiable under the new law."

In Hartranft v. Oliver, 125 U. S. 525, 8 Sup. Ct. 958, 31 L. Ed. 813, the bark containing the goods arrived before July 1, 1883, the date when the act in question there went into effect, but on that date were still on board the vessel; the vessel remaining with hatches unbroken, and with a customhouse officer in charge. The tariff act of 1883, c. 121, § 10, 22 Stat. 525, contained this provision:

"That all imported goods, wares and merchandise, which may be in public stores or bonded warehouses on the day and year when this act shall go into effect, except as otherwise provided in this act, shall be subjected to no other duty upon the entry thereof for consumption than if the same were imported respectively after that day."

The court said:

"The plain meaning of this section is that, though goods are imported before the act takes effect, yet, if they are kept until after that period in a public store or bonded warehouse—that is, in the custody and under the control of officers of the customs—they shall be subjected only to the duties thereafter leviable when they are entered for consumption."

If importation has not ceased while goods remain in the custody of the custom officers, so that the owner may avail himself of a change in the law reducing duties, while they so remain it is difficult to understand why it should not be held that importation is not so far ended but that goods, in this situation, becomes subject to an increase of duty, or to the imposition by law of duties, when none whatever were imposed at the date of entry. The plaintiffs had no vested right to exemption from duty so long as the goods remained in government warehouse under bond. While the goods remained there, the plaintiffs assumed the risks of the imposition of duties by the lawmaking power of the government.

It is said in Cooley's Const. Lim. (6th Ed.) p. 437:

"In organized society every man holds all he possesses, and looks forward to all he hopes for, through the aid and under the protection of the laws; but as changes of circumstances and of public opinion, as well as other reasons affecting the public policy, are all the while calling for changes in the laws, and as these changes must influence more or less the value and stability of private possessions, and strengthen or destroy well-founded hopes, and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any legal sense."

The collector had the right, when the goods were withdrawn, to exact the proper rate of duty under the law existing at the time of withdrawal. Reimer v. Schell, 4 Blatchf. 328, Fed. Cas. No. 11,676; Westfall v. Shook, 5 Blatchf. 383, Fed. Cas. No. 17,448; U. S. v. Benzon, 2 Cliff. 512, Fed. Cas. No. 14,577. And the proper rate of duties was that to which the merchandise was subject by the law in force at the time of withdrawal. See customs administrative act of

June 10, 1890, § 20, c. 407, 26 Stat. 140 [U. S. Comp. St. 1901, p. 1950]. In re Gardiner, 58 Fed. 1013, 4 C. C. A. 155; Hartranft v. Oliver, 125 U. S. 525, 8 Sup. Ct. 958, 31 L. Ed. 813; Sherman v. Robertson, 136 U. S. 570, 10 Sup. Ct. 1063, 34 L. Ed. 540; In re Mathews (C. C.) 45 Fed. 850; Merritt v. Cameron, 137 U. S. 542, 550, 551, 11 Sup. Ct. 174, 34 L. Ed. 772.

The only constitutional limitations on the power of Congress to lay taxes which it is necessary to allude to here are that the tax shall be for an object within the scope of the constitutional sovereignty of the United States, and that it shall be a tax of the kind authorized by the Constitution, and that it shall be uniform. Gibbons v. Ogden, 9 Wheat. 198, 199, 6 L. Ed. 23; Hylton v. U. S., 3 Dall. 173, 1 L. Ed. 556.

The duty imposed by the Foraker act on "all goods, wares and merchandise previously entered without payment of duty and under bond for warehousing, transportation or any other purpose for which no permit of delivery to the importer or his agent has been issued," is a uniform tax or duty, for the same duty is imposed upon all goods answering that description, no matter when imported or by whom. The importers, bringing in goods from Porto Rico and placing them in bonded warehouse, pay the same duty, respect being had, of course, to the value of the goods. To make taxation uniform, it is not necessary that all persons be taxed. Persons having a certain amount of property or more may be taxed, and those having a lesser amount may not be taxed at all. Such a law is constitutional. Persons having certain kinds or descriptions of property may be compelled to pay a tax on that property, and, so long as all of that class are taxed uniformly, the law is constitutional, even though other persons, having other kinds or descriptions of property, are not taxed at all. But however this may be, the question is definitely settled by the Supreme Court of the United States in Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088, where it is held:

"The island of Porto Rico is not a part of the United States, within that provision of the Constitution which declares that 'all duties, imposts, and excises shall be uniform throughout the United States.' A long-continued and uniform interpretation put by the executive and legislative departments of the government upon a clause in the Constitution should be followed by the judicial department, unless such interpretation be manifestly contrary to its letter or spirit. As Congress derives its authority to levy local taxes for local purposes within the territories not from the general grant of power to tax as expressed in the Constitution, it follows that its right to locally tax is not to be measured by the provision empowering Congress 'to lay and collect taxes, duties, imposts and excises,' and is not restrained by the requirement of uniformity throughout the United States. But the power just referred to, as well as the qualification of uniformity, restrains Congress from imposing impost duty on goods coming into the United States from a territory which has been incorporated into and forms a part of the United States. This results because the clause of the Constitution in question does not confer upon Congress power to impose such an impost duty on goods coming from one part of the United States to another part thereof, and such duty, besides, would be repugnant to the requirement of uniformity throughout the United States."

In the opinion it is said:

"Upon the other hand, when the Constitution declares that all duties shall be uniform 'throughout the United States,' it becomes necessary to inquire

whether there be any territory over which Congress has jurisdiction which is not a part of the 'United States,' by which term we understand the states whose people united to form the Constitution, and such as have since been admitted to the Union upon an equality with them. Not only did the people, in adopting the thirteenth amendment, thus recognize a distinction between the United States and 'any place subject to their jurisdiction,' but Congress itself, in the act of March 27, 1804, c. 56, 2 Stat. 298, providing for the proof of public records, applied the provisions of the act not only to 'every court and office within the United States,' but to the 'courts and offices of the respective territories of the United States, and countries subject to the jurisdiction of the United States,' as to the courts and offices of the several states. This classification adopted by the Eighth Congress is carried into the Revised Statutes as follows:

" 'Sec. 905 [U. S. Comp. St. 1901, p. 677]. The acts of the Legislature of any state or territory, or of any country subject to the jurisdiction of the United States, shall be authenticated,' etc.

" 'Sec. 906 [U. S. Comp. St. 1901, p. 677]. All records and exemplifications of books, which may be kept in any public office of any state or territory, or any country subject to the jurisdiction of the United States,' etc.

"Unless these words are to be rejected as meaningless, we must treat them as a recognition by Congress of the fact that there may be territories subject to the jurisdiction of the United States, which are not of the United States. In determining the meaning of the words of article 1, § 6, 'uniform throughout the United States,' we are bound to consider not only the provisions forbidding preference being given to the ports of one state over those of another, to which attention has already been called, but the other clauses declaring that no tax or duty shall be laid on articles exported from any state, and that no state shall, without the consent of Congress, lay any imposts or duties upon imports or exports, nor any duty on tonnage. The object of all of these was to protect the states which united in forming the Constitution from discriminations by Congress which would operate unfairly or injuriously upon some states, and not equally upon others. The opinion of Mr. Justice White in Knowlton v. Moore, 178 U. S. 41, 20 Sup. Ct. 747, 44 L. Ed. 969, contains an elaborate historical review of the proceedings in the convention which resulted in the adoption of these different clauses and their arrangement, and he there comes to the conclusion (page 105, 178 U. S., page 772, 20 Sup. Ct., 44 L. Ed. 969) that 'although the provision as to preference between ports and that regarding uniformity of duties, imposts, and excises were one in purpose, one in their adoption,' they were originally placed together, and 'became separate only in arranging the Constitution for the purpose of style.' Thus construed together, the purpose is irresistible that the words 'throughout the United States' are indistinguishable from the words 'among or between the several states,' and that these prohibitions were intended to apply only to commerce between ports of the several states as they then existed or should thereafter be admitted to the Union. We are therefore of opinion that the island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States, within the revenue clauses of the Constitution; that the Foraker act is constitutional, so far as it imposes duties upon imports from such island; and that the plaintiff cannot recover back the duties exacted in this case."

The objection that section 5 of the Foraker bill is unconstitutional because, in effect, it is an ex post facto law, is without merit, inasmuch as the prohibition against ex post facto laws applies only to criminal or penal statutes. Calder v. Bull, 3 Dall. 386, 390, 1 L. Ed. 648; Fletcher v. Peck, 6 Cranch, 138, 3 L. Ed. 162; Ogden v. Saunders, 12 Wheat. 266, 6 L. Ed. 606; Watson v. Mercer, 8 Pet. 110, 8 L. Ed. 876.

The complaint does say that the vessel Lilian Woodruff arrived at the port of New York "at or about June 24, 1899," and adds, in parenthesis, "the said sugars being those mentioned and de-

scribed in warehouse entry No. 101,121, bond No. 54,386, liquidated Nov. 14, 1899, reliquidated June 6, 1900." This falls far short of being an allegation that duties were assessed upon this sugar in November, 1899, under the provisions of the Dingley tariff act, and falls far short, when taken in connection with the other allegations of the complaint, of stating that these goods were held for the payment of duties levied under the Dingley act against the protest of the importers or otherwise. If this be the true construction of the complaint—and this court has no doubt on that subject—the foregoing considerations dispose of the case, and the demurrer must be sustained, with costs. There is no intimation from the Supreme Court of the United States that section 5 of the Foraker act is unconstitutional. In fact, the decision of the court in Downes v. Bidwell indicates clearly that that section of the Foraker law was in the mind of the court when it delivered its opinion and made its decision in that case.

The demurrer is sustained, with costs, but the plaintiff may amend on payment of such costs, if so advised, by pleading that the goods were detained, against the will and protest of the importer, for payment of duties under the Dingley act, until after the Foraker act went into effect. So ordered.