**RUIZ ALICEA v. UNITED STATES.**
### No. 4446.

United States Court of Appeals
First Circuit.
March 10, 1950.

J. Henandez Valle San Juan, P. R. (Agustin Perez Rodriguez, San Juan, P. R., on brief), for appellant.

Pascual Amado Rivera, Assistant U. S. Attorney, San Juan, P. R. (Francisco Ponsa Feliu, United States Attorney, San Juan, P. R., on brief), for appellee.

Before MAGRUDER, Chief Judge, and MARIS and WOODBURY, Circuit Judges.

MAGRUDER, Chief Judge.

Miguel Angel Ruiz Alicea, a native and resident of Puerto Rico, and as such a citizen of Puerto Rico and of the United States, was convicted and sentenced in the United States District Court for the District of Puerto Rico for violation of the Selective Service Act of 1948, 62 Stat. 604, 50 U.S.C.A.Appendix, § 451 et seq., in that he knowingly failed and neglected to present himself for and submit to registration as required by §§ 3 and 12(a) of said Act, and of the President's Proclamation No. 2799 thereunder, 13 F.R. 4173, 50 U.S.C.A.Appendix, § 453 note.

The only question before us is whether the district court erred in denying an elaborate motion by the defendant that the indictment be quashed and the case dismissed "on the ground that this Court lacks jurisdiction over the defendant because the Selective Service Law is not legally applicable to Puerto Rico." We hold that the motion was properly denied.

So far as the intention of Congress is concerned, it is clear that the Selective Service Act of 1948, by its express terms, is applicable to Puerto Rico. See § 3 and §§ 16(a) and (b). Appellant does not contend to the contrary.

However, appellant argues at length in his brief, though the point was not specifically made in the motion to quash, that the Treaty of Paris, 30 Stat. 1754, ratified by Spain and the United States at the conclusion of the Spanish-American War, was and is null and void in so far as Spain purported therein to cede Puerto Rico to the United States. As far back as 1901, in De Lima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041, the Supreme Court of the United States recognized the validity of the treaty in holding, 182 U.S. at page 196, 21 S.Ct. at page 752 that "by the ratification of the treaty of Paris the island became territory of the United States, although not an organized territory in the technical sense of the word"; and since then the cases dealing with the legislative powers of Congress over Puerto Rico have without exception proceeded on that basis. Appellant could hardly expect us, as an intermediate appellate court, to undertake to overrule a half-century of history. Besides, the historical and juridical arguments which appellant has advanced in this connection have been fully and convincingly demolished. See José López Baralt, Is the Paris Treaty Null "Ab Initio" as to the Cession of Puerto Rico?, 6 Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico, p. 60 (1941).

It is further contended that Puerto Rico has no voting representation in the Congress of the United States; that it occupies a status inferior to that of "incorporated" territories, such as Hawaii and Alaska, and thus "is not entitled to enjoy equality of rights with the states nor with incorporated territories, which are on the way to become states"; that therefore the imposition of compulsory military service on residents of Puerto Rico "is a violation of the basic constitutional principle that equality of duties is based on equality of rights."

In People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 261–262, 58 S.Ct. 167,

171, 82 L.Ed. 235, the Court said: "The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. * * * The effect was to confer upon the territory many of the attributes of *quasi* sovereignty possessed by the states—as, for example, immunity from suit without their consent. * * * By those acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. 'A body politic'—a commonwealth—was created. 31 Stat. 79, § 7, c. 191 [48 U.S.C.A. § 733]. The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And, so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures."

Evolution in the direction of greater local autonomy is evident in the amendment of the Organic Act by the Act of August 5, 1947, 61 Stat. 770, 48 U.S.C.A. §§ 737, 771–772, 775, 793b, 797, under which the people of Puerto Rico were given the right to choose their own governor by popular suffrage—a right never before accorded to a territory of the United States. There is no reason to suppose that the evolutionary process is now at an end. Certainly nothing in the development to date would preclude the possibility of ultimate statehood. On the other hand, perhaps Puerto Rico will eventually achieve some unique status under the American flag more satisfactory to its people than statehood.

Whatever may be the future status of Puerto Rico, it is clear that in the present situation Congress has power to impose compulsory military service under an Act applicable, without discrimination, to citizens of the United States resident in Puerto Rico as well as to citizens of the United States resident in other territories and in the States of the Union. See Selective Draft Law Cases (Aver v. U. S.), 1918, 245 U.S. 366, at page 378, 38 S. Ct. 159, at page 161, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas.1918B, 856, in which the Court said: "It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need, and the right to compel it." See also United States v. Henderson, 7 Cir., 1950, 180 F.2d 711. That Puerto Rico now has no voting representation in Congress is of no significance in this connection; the same is true of the District of Columbia, and it is not suggested that Congress lacks power to draft into the armed forces citizens of the United States resident in the District of Columbia. In fact, Congress may draft aliens resident in the United States, though they may not be entitled to vote for election of representatives in Congress, or even to participate in state or municipal elections. United States v. Lamothe, 2 Cir., 1945, 152 F.2d 340; Leonhard v. Eley, 10 Cir., 1945, 151 F.2d 409.

A further argument is drawn from the ratification by the United States of the Charter of the United Nations, 59 Stat. 1031. Under Chapter XI, Article 73, of this international treaty, the United States and other members of the United Nations who have assumed responsibilities "for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of these territories are paramount, and accept as a sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories". To this end, the Administering States accept the obligation to ensure the "just treatment" of the inhabitants of such territories "and their protection against abuses;" "to develop self-government, to take due account of the political aspirations of the peoples, and to assist them in the progressive development of their free political institutions"; to further international peace and security; to promote constructive measures of development in social, economic, and scientific fields; and to transmit regu-

larly to the Secretary-General for information purposes "statistical and other information of a technical nature relating to economic, social, and educational conditions" in said non-self-governing territories. Whether or not Puerto Rico is a territory whose people "have not yet attained a full measure of self-government", within the meaning of Article 73, nevertheless the United States has, without raising the point, in fact regularly transmitted to the Secretary-General information of the sort described with reference to Puerto Rico.

It is contended that the imposition of compulsory military service on Puerto Rico "is to the detriment of the interests of the people of Puerto Rico and to the sole benefit of the United States", and hence is in violation of the obligation of the United States, under the treaty, to give paramount regard to the interests of the inhabitants of the territory. We think this is obviously not so. In accepting the obligation to promote the well-being of the people of Puerto Rico, the United States presumably would be expected to protect the inhabitants of the island from subjugation by a hostile power. It would therefore seem not to be unjust, or to the detriment of the people of Puerto Rico, to require their service in the armed forces of the United States on an equal basis with residents of continental United States.

Moreover the argument fails, because Chapter XI of the Charter, in contrast with Chapter XII, describing the International Trusteeship System, and Chapter XIII, establishing the Trusteeship Council, provides no machinery for international supervision and control of the administration on non-self-governing territories. Article 73, upon ratification of the Charter by the United States, did not have the legal effect of altering the domestic status of Puerto Rico under the Constitution of the United States, or of curtailing the constitutional power of Congress to legislate with reference to such territory.

Finally, appellant seeks support in a resolution with reference to Puerto Rico adopted at a meeting last year in Havana, Cuba, of the American Committee on Dependent Territories, constituted pursuant to Resolution No. XXXIII of the Final Act of the Ninth International Conference of American States at Bogotá, Colombia, May 2, 1948. The resolution in question seems to have gone beyond the competence of the American Committee on Dependent Territories, which was assigned the general function of seeking pacific means of eliminating "colonialism and the occupation of American territories by extra-continental countries". Furthermore, appellant has failed to point out upon what theory a court of the United States would be justified in recognizing a resolution of that Committee as having the slightest legal effect upon the status of Puerto Rico under the American flag.

The judgment of the District Court is affirmed.