**UNITED STATES of America, Plaintiff,**

v.

**Miguel Gonzalez VARGAS, Defendant.***

**Crim. No. 62–72.**

United States District Court, D. Puerto Rico.

Jan. 29, 1974.

---

* Consolidated with:
U. S. v. Walter Acosta Cartagena, 115–72; U. S. v. Ramon Bosque Perez, 178–72; U. S. v. Angel Agosto Agosto, 173–72; U. S. v. Carlos Maysonet Negron, 172–72; U. S. v. Angel Diaz Ruiz, 174–72; U. S. v. Pedro Roberto Velez Fernandez, 171–72; U. S. v. Mario C. Rios Escobar, 158–72; U. S. v. Rafael Rodriguez Zaldo, 154–72; U. S. v. Juan Garcia Badillo, 191–72; U. S. v. Luis Medina Mercado, 195–72; U. S. v. Ruben A. Ramirez Rodriguez, 185–72; U. S. v. Jose Rafael Perez Acevedo, 197–72; U. S. v. Antonio Herrera Castillo, 153–72; U. S. v. Victor Medina Rivera, 333–72; U. S. v. Carlos H. Garcia Guzman, 155–72.

Asst. U. S. Atty. José A. Quiles, San Juan, P. R., for plaintiff.

José Hamid Rivera, Santurce, P. R., for defendants.

## MEMORANDUM AND ORDER

CANCIO, Chief Judge.

Defendants herein have been indicted for failure either to register with the Selective Service System within ten days of their eighteenth birthday in violation of Title 50, U.S.C., Appendix Sections 453, 462(a) and 32 Code of Federal Regulations, Section 1611.4, to report for and submit to an Armed Forces physical examination in violation of Title 50, U.S.C., Appendix Section 462 and 32 Code of Federal Regulations, Section 1628.16, or to report for induction, training and service in the Armed Forces in violation of Title 50, U.S.C., Appendix Sections 454, 462(a), and Selective Service Regulations, Section 1632.14(b)(5).

In view of defendants' contention that in all of the above cases legal issues and defenses common to all defendants would be presented, this Court permitted consolidation.

Subsequent to their indictment by a Grand Jury, defendants filed a motion for dismissal asserting as grounds therefor, the following:

(a) prosecution of defendants for violation of the 1967 Selective Service Act is, per se, an infliction of cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

(b) Puerto Ricans are discriminated against in the Armed Forces of the United States.

(c) the United States violates international law when, in face of its political relationship to Puerto Rico, it forcibly conscripts Puerto Ricans into the Armed Forces of the United States, and that

(d) the Geneva Convention (Article 51, Section 31) bars prosecution of defendants.

On June 7, 1973 plaintiff filed a reply to defendants' motion for dismissal.

On August 13, 1973 defendants filed a motion that the Court has considered as an amendment to the original motion to dismiss. The contention presented in the amendment is to the effect that in the *light of the developments of the "Watergate affair" and related investigations it would constitute an act of cruelty to criminally prosecute defendants for violation of the Selective Service Act. Plaintiff countered with a reply on August 16, 1973.

After seeking a hearing on the motion for dismissal, defendants withdrew their request and submitted the matter for resolution by the Court on all the written documents contained in the record.

A. *Whether prosecution of defendants constitutes infliction of cruel and unusual punishment.*

■ Defendants contend that the Eighth Amendment to the United States Constitution demands dismissal of the indictments in this case since their prosecution for violation of the 1967 Selective Service Act is, per se, an infliction of cruel and unusual punishment. They rely heavily on their interpretation of Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), in which the crime of being a narcotics addict was held to be constitutionally infirm. In *Robinson,* the Supreme Court of the United States held that the Eighth Amendment could be erected as a protective barrier on behalf of certain individuals or group of individuals, from being branded and prosecuted as criminals.

The Court stated:

"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might require that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involuntary quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 370 U.S. 660, at 666, 82 S.Ct. 1417, at 1420.

The statute there in question made it a misdemeanor for a person either to use narcotics or to be addicted to the use of narcotics. The California law had stated that a person could be continuously guilty of this offense whether or not he had been guilty of any antisocial behavior there. Such a statute created, no doubt, a " 'status' of narcotic addiction a criminal offense for which the offender might be prosecuted at any time before he reformed." Robinson v. California simply declares a law which creates a "status" crime unconstitutional.

Defendants also lean on Chester J. Antieau, who, commenting on the development marked by Robinson v. California, has said: "Quite aside from the question of the kind and amount of punishment that ought to be permitted in a

civilized society, there is a growing number of cases holding that the criminal law ought not to be applied at all to certain types of behavior traditionally treated as criminal." [1] Defendants pretend to apply this reasoning to the case at hand where defendants for political motivations have refused to obey the Selective Service Act. However, this doctrine has been extended only to cases where "sick" persons such as drug addicts or chronic alcoholics have raised the defense that they are not responsible because the conduct charged in the prosecution was neither carried out by an evil intent nor accompanied with a consciousness of wrongdoing. Thus, in confronting the issue, the Supreme Court took what has been labeled the "illness approach."

Constitutionalist Chester J. Antieau comments that in Driver v. Hinnant, 356 F.2d 761 (1966), the Fourth Circuit held that *Robinson* must apply not only to crimes of "status" for which a person is not responsible but also "to those acts . . . which are . . . symptomatic of the disease", because the conduct charged in that prosecution, public drunkenness, was neither actuated by an evil intent nor accompanied with a consciousness of wrongdoing. Clearly, this is not the case before this Court, where defendants are charged with violating the Selective Service Act, there being no element of "sickness" involved. On the contrary, the defendants allege that they represent a much larger group of honest, respectful young men who are intellectually tuned to the political and social problems of their country. Evidently, defendants cannot be considered "sick" in the sense that the word has been construed in the cited cases.

It is worthwhile to note that the Supreme Court in a number of cases after *Robinson, supra,* has refused to extend the former case even when a "sick" person was involved, if the crime prosecuted was one of acts and not of "status" of being something. In Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254, for example, the Supreme Court affirmed a Texas lower court that convicted a chronic alcoholic. But the conviction was based not on his being an alcoholic but on the acts he performed, even though he was drunk at the time of their commission.

Therefore, what must be taken as a guiding principle is whether the prohibition is for being something, for example, for being an addict, or for doing something, as refusing to register.

What constitutes cruel and unusual punishment has never been determined with any degree of certainty by the courts. This is probably due to the fact that the concept changes with the continual development of society and with sociological views concerning appropriate punishment for crime. The courts, however, have worked out a general approach to the question. A noteworthy approach appears in Workman v. Commonwealth, 429 S.W.2d 374, 33 A.L.R.3d 326 (Ky.), where it is said that you must determine whether, in view of all of the circumstances, the punishment in question is of such character as to shock the general conscience and to violate the principles of fundamental fairness.

Punishing defendants for failure to obey the Selective Service Act cannot be considered to shock the general conscience nor to violate the principles of fundamental fairness. The act makes "every male citizen of the United States [between the requisite ages] liable for training and service in the Armed Forces." (Title 50, U.S.C., App. § 454(a)). Puerto Ricans are citizens of the United States. (Title 8, U.S.C., Section 1402).[2] Defendants are all citizens of the United States and must fulfill their military obligations like the rest of

---

1. Antieau, Modern Constitutional Law, Vol. 1, Section 2.5, page 154.

2. For the purposes of this order the Court is not considering the suspension of the

draft law inasmuch as the acts giving rise to these indictments took place prior to July 1, 1973. (See Title 50, U.S.C., App. § 467.)

the citizens who are liable to be called to serve in times of war and peace, in the Armed Forces. Section 6(j) of the Selective Service Act of 1967 (50 U.S.C. App. § 456(j)) affords a remedy to those who, based on moral or religious convictions, refuse to be inducted into the Armed Forces. The defendants, however, refuse to be considered conscientious objectors for the purposes of said section of the Act.

They denounce what they term as the classic stand of conscientious objection to war in any form, based on religious or moral convictions. Defendants propound a form of conscientious objection "born out of a politico-moral conviction". Their position is clear in that they do not repudiate war in any form but "reserve the right to fight a war of independence for Puerto Rico if circumstances so require." (See page 3, Defendants' Brief).

Assuming, however, that such a novel theory on conscientious objection were to be considered plausible, it would require an evidentiary hearing as to each individual concerned in order for the court to reach a conclusion as to the existence and sincerity of the asserted patriotic sentiments. This evidence would be best presented during a full scale trial covering all aspects of the merits of the case.

■ At this juncture let us point out that the policy of the Commonwealth of Puerto Rico as voiced by its Secretary of State with respect to the Selective Service Act[3] cannot be deemed a rule of law binding on this Court, as claimed by defendants.

B. *Alleged discrimination against Puerto Ricans in the Armed Forces of the United States.*

■ The Court is not at all impressed by the argument that the indictments should be dismissed because of alleged widespread discrimination against Puerto Ricans in the Armed Forces.

Neither the Fourteenth nor the Fifth Amendments prohibit the Government from prosecuting defendants in this case for their refusal to comply with requirements of the Selective Service Act and related regulations. It is a firmly embedded principle of constitutional law that the President and Congress have the power to provide for the creation and regulation of the Armed Forces. In the Selective Service Draft Law cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, the constitutionality of the Selective Service Draft Law was upheld against various constitutional objections. In United States v. O'Brien, 391 U.S. 367, at page 377, 88 S.Ct. 1673, at page 1679, 20 L.Ed.2d 672, the Supreme Court, said: "The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping. . . . The power of Congress to classify and conscript manpower for military service is 'beyond question.'" See also Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694. Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87

---

3. The Court is particularly referring here to certain expressions attributed to the Secretary of State of Puerto Rico, Mr. Victor Pons, published at page 3 of the November 26, 1972, edition of the San Juan Star. The excerpts quoted by defendants in their brief are the following:

"Puerto Rico should‚have a voice in deciding how the draft is applied here, Secretary of State-designate, Victor Pons said Saturday.

Pons said he believes the draft 'is one of the areas (in U.S. Commonwealth relations) where it is justified that Puerto Rico have more participation in the decisionmaking.'

The administration of Gov.-elect Rafael Hernández Colón will seek 'more effective ways to participate in federal decisions affecting Puerto Rico,' Pons added.

Pons did not go into specifics, but said the draft is one of the areas which will come under scrutiny when the new administration tries to get more autonomy for the island."

The Court may fully agree with these words, but its desire, as expressed in United States v. Feliciano Grafals, 309 F.Supp. 1292 (D.P.R., 1970), is not sufficient to change the law, which it has to apply as it finds it.

L.Ed. 3. It is of paramount importance to the national security of the United States that the power of Congress and the President to create and regulate the Armed Forces not be abridged or hindered in any way. It is a duty of all male American citizens to serve in the Armed Forces when called, including of course United States citizens born and residing in Puerto Rico. Whether these principles, long rooted in the very essence of our constitutional framework are to be overshadowed by defendants' allegations of discrimination against Puerto Ricans, generally, in the Armed Forces, is a matter all too simple to require a lengthy discussion.

The various cases cited by defendants have no relevance to the particular issue now under judicial scrutiny, even by analogy. The cases of Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880), Cassel v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 and Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244, held that a negro had a right not to have excluded members of his race from the composition of the jury and that his conviction could be invalidated because of the possibility of prejudice against negroes. The defendants relate this decision to the concept of "civilian neighbors" of the Selective Service System by making an analogy between this concept and the common law concept of the jury. They thus reach the conclusion that the same rights granted to negroes should be granted to Puerto Ricans within the context of this analogy. This reasoning of the defendants does not give sustenance to their position that discrimination within the Armed Forces is a bar to criminal prosecution for refusing to serve in the Armed Forces. In viewing the analogy in its proper perspective, the only logical argument that can be derived from it can only be directed against the mechanism of selection of citizens for induction into the Armed Forces, but this is tantamount to saying that the Puerto Ricans who compose the "local boards" discriminate against themselves as an ethnic group in the selection.

The constitutional principle that a person cannot be subjected to criminal sanction if he refuses to relinquish a constitutional right or privilege cannot lend any strength to defendants' contention. In the recent cases of United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, and Pearce v. North Carolina, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, the Supreme Court of the United States rested its decision upon this principle. In *Jackson* it was held that a statute cannot penalize a defendant by imposing a harsher punishment if the defendant avails himself of his right of jury trial. In *Griffin*, the state prosecutor was prohibited from commenting on the failure of the defendant to take the stand in his defense because of the harmful effect it can have on the jury, and in *Pearce* the Court drastically restricted the power of trial courts to give harsher punishments after a second trial was reversed on appeal.

The above cited cases can be used as precedents to the present issue if it can be proved that Puerto Ricans suffer discrimination within the Armed Forces. If this were the case, the equal protection clause of the Fifth Amendment would come into effect to prevent Puerto Ricans from being criminally prosecuted because of their refusal to be discriminated against in an unconstitutional manner within the Armed Forces.

The existence of discriminatory practices in the Armed Forces would have to be borne out of an evidentiary hearing. Defendants would have to come forth with specific acts in support of a showing that such discrimination actually exists. Additionally, specific orders, regulations, or laws governing the Armed Forces would have to be proved discriminatory, as it would not suffice to state that generally officers and men in positions of power discriminate against Puerto Ricans.

The defendants also cite two additional cases that are not in point. The case of Sellers v. Laird, 395 U.S. 950, 89 S.Ct. 2022, 23 L.Ed.2d 470, is a dissenting opinion of Justice Douglas of an order of the Supreme Court denying a certiorari. The issue was whether an all-white local board of the Selective Service System may result in negroes carrying more than their fair share of the Viet Nam burden. The issue of discrimination within the Armed Forces was not involved. DuVernay v. United States, 394 U.S. 309, 89 S.Ct. 1186, 22 L.Ed.2d 306, the other case cited, only decides that the failure to exhaust the administrative remedies by an appellant prevents him from challenging the legality of the procedure of inducting men into the Armed Forces on the ground of absence of negroes in the local boards. The issue of discrimination within the Armed Forces was never considered. At any rate, the Court is forced upon the conclusion that the situation presented in the *DuVernay* case, *supra*, is definitely not comparable to the issue now before us.

C. *Validity of the Selective Service Act in face of the political relationship between the United States and Puerto Rico.*

■ Defendants argue that since the relationship of the United States to Puerto Rico is "that of an administrating power to a colonial territory," it violates fundamental obligations of the United States under international law and treaty arrangements to forcibly conscript Puerto Ricans into the Armed Forces of the United States. Specifically, defendants allege that the conscription of Puerto Ricans violates the United Nations Charter, Article 73(a),[4] by failing to take into account the political and cultural aspirations of the people of Puerto Rico. In support of their contention that a law which is in conflict with a treaty must be annulled, they cite Oyama v. California, 332 U.S. 633, 68 S. Ct. 269, 92 L.Ed. 249 (1948), where California's Alien Land Law, which prevented aliens eligible for naturalization to own land, as applied to appellant, deprived him of the equal protection of the laws. The sole basis for the discrimination against appellant, which resulted in losing his land irretrievably and without compensation, was the fact that his father was an ineligible alien. In support of their contention that Article 73(a) is self-executing and does not need enabling legislation, defendants cite Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), where the Supreme Court decided that it would not examine the validity of an expropriation by a foreign sovereign government in the absence of a treaty or other unambiguous agreement regarding controlling legal principle, even if the complaint alleged that the taking violated customary international law. Defendants interpret this holding to mean that where there is a treaty, federal courts must adjudicate on the merits.

Defendants have clearly misinterpreted the decisions cited above. In Oyama v. California, *supra*, the concurring judges agreed that the fact that an article of the United Nations Charter is incongruent with a state law is an argu-

---

4. Article 73(a) of the United Nations Charter states:

"Chapter XI Declaration Regarding non-self-governing territories

Article 73

Members of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of these territories are paramount, and ac-cept as a sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories, and, to this end:

a. to ensure, with due respect for the culture of the peoples concerned, their political, economic, social, and educational advancement, their just treatment, and their protection against abuses; * * *"

ment against the validity of such law. They do not assert that such incongruency invalidates the law. Moreover, the law in question was not a federal law, but a state law with other more important constitutional defects.

The Charter provision in question is not a specific mandate, but rather a general standard or goal to be followed by nations with sovereignty over dependent territory. Assuming, arguendo, that the Commonwealth of Puerto Rico is a dependent territory under the definition used for Charter purposes, Article 73(a) is not self-executory. Congress, which has the responsibility to implement this section through enabling legislation, has decided to conscript Puerto Ricans notwithstanding Article 73(a).

Moreover, the second case cited by defendants in their support, Banco Nacional de Cuba v. Sabbatino, *supra,* holds that federal courts will not enter into political problems of international law unless an unambiguous treaty controls and the question is not one in which there is disagreement as to relevant international law standards. The opinion of the court, 376 U.S. at page 430, 84 S. Ct. at page 941, says: "It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations."

Defendants are asking the court to enter upon an area of extreme political sensitivity, basing their request on an ambiguous and broad section of the Charter of the United Nations which cannot be held binding in the absence of enabling legislation.

The same argument now posed by defendants was also raised in the case of United States v. Manuel Amy Valentine, 288 F.Supp. 957 (D.C.1968), albeit in a slightly different context. However, in that case this Court made a detailed analysis of the political relationship between the United States and Puerto Rico. Considering the main thrust of defendants' contention in· this case in light of this Court's opinion in *Amy Valentine, supra,* it must be concluded that the question of the validity of the Selective Service Act in view of Puerto Rico's relation to the United States has been specifically resolved against defendants.

Beginning at page 981 of the cited opinion, we stated:

"Apparently misunderstanding the relationship of the compact to the Selective Service Act's applicability to Puerto Rico, defendants argue that there is no compact; that if the compact exists it has no relevance to selective service; and that applying selective service to Puerto Rico violates the compact if it exists. Even if they were correct in their initial assertion, their argument against the indictments would not be advanced. The liability of Puerto Ricans for military service arises not from the compact but from their United States citizenship, which antedates the compact (although it was specifically reaffirmed and made unilaterally irrevocable by that document). If defendants were correct and there were no compact, which is not true, Puerto Ricans would nevertheless remain American citizens and hence subject to military service.

"It is clear, however, that the compact does exist as a binding agreement, irrevocable unilaterally between the people of Puerto Rico and the Congress of the United States, transforming Puerto Rico's status from territory to commonwealth, or Estado Libre Asociado.[24] The best evidence that

(Footnote 24 of the *Amy Valentine* case)

To say that the compact is irrevocable unilaterally is not to say that all of its detailed provisions are. It is only the essential provisions which cannot be revoked by one party acting alone: i. e., the provisions which establish Puerto Rico's status as a commonwealth with plenary domestic authority, its association with the United States, the United States citizenship of its people, and such favorable concessions as its fiscal autonomy. There are peripheral provisions, however, which were retained in the Federal Relations Act because there was no place else to

put them: e. g., the provisions governing procedures in this court. In regard to the Court, the only essential element of the Compact is that the agreement to associate with the United States provides the present basis for its existence. But since the Court is a federal one, it is properly governed by rules established by Congress alone. Hence, the fact that Congress has repealed 48 U.S.C. § 867 (§ 44 of the Federal Relations Act) in favor of uniform rules for jury selection throughout the federal judicial system does not affect the inviolability. of the compact.

this is so lies in the Commonwealth Constitution. Territories are governed by organic acts, enacted by Congress, unilaterally amendable by Congress, unilaterally revocable by Congress. Puerto Rico, however, is governed by a constitution adopted by the vote of its people. While the constitution was submitted initially to Congress for approval (as in the case of the initial constitutions of new states) a proposal that subsequent amendments thereto must be approved by Congress was deleted from the enabling resolution (S.J. Res. 151) at the insistence of the government of Puerto Rico. 98 Cong.Rec. 7840 et seq., 8306–07, 8618–19. A proposal that the enabling resolution state that Congress retained its powers over Puerto Rico under the Territorial Clause of the Constitution was also rejected. Id. at 6183 et seq. In short, in respect to domestic authority, the status of the Commonwealth essentially parallels that of the states. It is only in regard to national political participation, voluntarily waived by the Puerto Rican people, that the status is different.

"Since the people of Puerto Rico, in accepting the compact, rejected both independence and statehood (and reaffirmed their choice in the 1967 plebiscite, where the independence and statehood alternatives, being specifically presented, were specifically rejected), it cannot be said that the imposition of military service without national political participation comprises an invidious discrimination forbidden by the Fifth Amendment. By

rejecting independence and accepting a free association with the United States and the United States citizenship, the people of Puerto Rico accepted the duties of citizenship, including liability for military service. By rejecting statehood and accepting the commonwealth status, they disclaimed any counterdemand for participation in the national political process. Rather, they determine that at this stage in Puerto Rico's development, commonwealth status, with its attendant fiscal autonomy, would serve their interests better than the national political participation they would gain by statehood.[25]

(Footnote 25 of the *Amy Valentine* case)

Defendants contend that the vote accepting the compact could not have legitimized the application to Puerto Rico of the Selective Service Act, on the grounds that the constitutional rights of an individual are not subject to limitation by majority vote in an election. Compare Lucas v. Forty-Fourth Colorado Gen. Assembly, 377 U.S. 713, 736, 84 S.Ct. 1459, 12 L.Ed.2d 632. This argument exposes the essential fallacy of their whole position. An individual need not personally possess the franchise in order to be constitutionally subject to compulsory military service. George v. United States, [196 F.2d 445, 454–455 (C.A.9, 1952), certiorari denied, 344 U.S. 843, 73 S.Ct. 58, 97 L.Ed. 656]. Defendants recognize this principle, and hence base their objection to their induction on the ground that the community of which they are members is denied the national franchise. Thus, it is only the obligation which they seek to avoid which is personal; the asserted right whose denial they offer as justification for such avoidance is communal. A community, however, can waive, barter away, or fail to claim its corporate rights the same as an individual can waive, barter away, or fail to claim his personal rights. Defendants have no standing, as individuals, either to object to the waiver or to assert that their personal obligations as citizens were diminished thereby.

"Defendants argue, however, that the preamble to P.L. 600 recognizes 'the right of self-government of the people of Puerto Rico,' and that under the circumstances the Selective Service Act is inconsistent with that right and thus was repealed, in respect to Puerto Rico, by its Section 6. They

confuse self-government with either statehood or independence. 'Self-government,' in the context used, means plenary domestic political authority as a matter of right, rather than grace. This the Compact establishes. It is only statehood, however, which permits full participation in the process by which uniform national laws are enacted, and only independence which would allow Puerto Rico to determine for itself, with the exclusion of all other, whether compulsory military service would be imposed upon its citizens. By consenting to the Compact, the people of Puerto Rico have rejected both alternatives. It follows that the application here of the Selective Service Act is thoroughly consistent with the Compact and the will of the people of Puerto Rico."

Defendants' argument with respect to the legality of the Treaty of Paris was also considered by this Court in *Amy Valentine*. There we stated the following at page 982 of 288 F.Supp.:

"Defendants also argue that the cession of Puerto Rico to the United States by the Treaty of Paris (30 Stat. 1754) was illegal under Spanish law. They do not ask this Court to declare that the cession was unlawful in toto and that Puerto Rico is therefore still a possession of Spain. Rather, they ask a declaration that, because of its illegality, the Selective Service Act can have no application here. It is difficult, however, to perceive how the cession could be void for one limited purpose without being void for all purposes. In any event, their contention was fully canvassed and specifically and correctly rejected in Ruiz Alicea, 180 F.2d 870 at 871. See also DeLima v. Bidwell, 182 U.S. 1, 195–196, 21 S.Ct. 743, 45 L.Ed. 1041; Dooley v. United States, 182 U.S. 222, 234, 21 S.Ct. 762, 45 L.Ed. 1074. The Supreme Court explained long ago that questions concerning the power of a sovereign to annul by treaty a prior grant to his subjects 'are political questions and not judicial' which 'belong exclusively to the political department of government.' Doe ex dem Clark v. Braden, 16 How. 635, 656, 14 L.Ed. 1090. Nor is defendants' contention aided by the argument that, since Spain had no legal right to impose compulsory military service upon the citizens of Puerto Rico, the United States could not have acquired that right by cession. To the contrary, the cession resulted, in the long run, in Puerto Ricans becoming citizens of the United States. Whatever limitations there were upon their duties as subjects of the King of Spain, it can hardly be thought that they now have less duties than do other citizens of this country. Compare Vilas v. City of Manila, 220 U.S. 345, 357, 31 S.Ct. 416, 55 L.Ed. 491; Chicago, Rock Island & Pacific Railway Co. v. McGlinn, 114 U.S. 542, 546, 5 S.Ct. 1005, 29 L.Ed. 270; Downes v. Bidwell, 182 U.S. 244, 298, 21 S.Ct. 770, 45 L.Ed. 1088 (White, J., concurring.)"

The Court today holds the same opinion expressed in the *Amy Valentine* case.

D. *The Geneva Convention (Article 51, Section 31) as a bar to prosecute defendants.*

■■ The defendants allege that the Geneva Convention relative to the protection of civilian persons in time of war is a bar to their prosecution because Article 51, Section 31, of that convention states: "The occupying power may not compel protected persons to serve in its armed or auxiliary forces. No pressure or propaganda which aims at securing voluntary enlistment is permitted."

Is Puerto Rico an occupied territory of the Armed Forces of the United States? The answer must be no. Puerto Rico, by virtue of Law 600 of

Congress, approved a Constitution. Law 600 was approved by the People of Puerto Rico in a referendum, then delegates to a constitutional convention were elected democratically on August 27, 1951. On March 3, 1952, the People of Puerto Rico, by universal suffrage in a peaceful and democratic manner, approved a constitution creating the present political status of Commonwealth (Estado Libre Asociado). Approximately 82 per cent of those Puerto Ricans that participated in the referendum voted for approval. Puerto Ricans in a democratic way have associated themselves with the United States in a bilateral agreement binding upon both the Puerto Ricans and the Congress of United States. This binding compact or agreement cannot be unilaterally revoked. The Puerto Rican Federal Relations Act governs the constitutional and political relation of Puerto Rico and the United States. (Public Law 600, 81 Congress, 2d Session, Section 4). It can be said that Puerto Rico is not an occupied territory, since their people have freely chosen their form of government and political status.

Even the General Assembly of the United Nations, the highest body of that organization, in 1953, approved a resolution recognizing that Puerto Rico has attained an autonomous status and that the United States did not have the obligation of continuing to transmit information regarding Puerto Rico as provided by Article 73, Section (e), Chapter XI, of the Charter of the United Nations.

Chapter XI of the Charter of the United Nations deals with territories who do not have self government or autonomy. The General Assembly resolution of 1953 (Asamblea General, Octavo Período de Sesiones Plenarias 1953), specifically said that it recognizes that the People of Puerto Rico, in choosing their constitutional and international status of Commonwealth (Estado Libre Asociado), have effectively exercised their right of self-determination.

The United Nations special committee on colonialism created by the General Assembly in 1961 and enlarged in 1962 to 24 members, for the purpose of applying the General Assembly Resolution 1514(XV) of December 14, 1960, that declared the necessity of ending rapidly and unconditionally the prevailing colonial manifestation in the world, approved a resolution on August 28, 1972. That resolution instructed its working group to report at an early date in 1973 to the committee in relation to the procedures to be followed by the committee for the implementation of General Assembly Resolution 1514(XV) with respect to Puerto Rico.

To this date the special committee on colonialism has not made any formal declaration and the General Assembly Resolution of 1953 is in all force and effect and is the last pronouncement of the highest body of the United Nations in relation to the political status of Puerto Rico.[5]

5. On August 30, 1973, the Special Committee on Colonialism adopted a resolution (A/AC.-109/438), (which is reproduced below), at its 948th meeting, with respect to the case of Puerto Rico, which the Court is aware of:

"*The Special Committee*,

"*Having considered* the question relating to its resolution of 28 August 1972 concerning Puerto Rico,[15]

15. Official Records of the General Assembly, Twenty-seventh Session, Supplement No. 23 (A/8723/Rev. 1), chap. I, para. 85.

"*Having heard* the statements of representatives of the Puerto Rican Socialist Party and the Puerto Rican Independence Party,[16]

16. A/AC.109/PV. 943 and 944.

"*Reaffirming* that, in conformity with the Declaration on the Granting of Independence to Colonial Countries and Peoples, contained in General Assembly resolution 1514(XV) of 14 December 1960, all peoples have the right to self-determination and by virute of that right they freely determine their political status and freely

■ Does the United Nations have the power, speaking in terms of international law and strict morals, to intervene in the political relation of Puerto Rico and United States which has been approved democratically by the People of Puerto Rico? Again, the answer must be no. The People of Puerto Rico in the 1967 plebiscite decided to continue the present political status with improvements to be made. Sixty percent of the Puerto Ricans that voted approved the present status.[6]

The Universal Declaration of Human Rights approved by the General Assembly on December 10, 1948, in Chapter 21, Section 3, says: "The will of the people is the basis of authority by the governments. This will should be expressed through authentic election that will take place periodically by universal suffrage in an equal way and by secret means or other equivalent procedure that will warrant the right to vote."

The Charter of United Nations, in Section 2 of Article 1, states that one of the purposes and aims of the United Nations is to "develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples." The General Assembly's Resolution 1514(XV) of December 14, 1960, that the abolition of colonialism is a necessity in today's world, states in Section 2: "Every country has the right to self-determination; by virtue of that right they will choose in complete liberty their political condition and pursue their economic social and cultural development." The United Nations cannot therefore impose independence to Puerto Rico without doing violence to the principle of self-determination. The Geneva Convention of 1949 does not apply to Puerto Rico because it is not an occupied territory, it is a unique form of government that has exercised the right to self-determination. If this Court were to decide that the Geneva Convention of 1949 applies, it would violate the principle of self-determination. A reading of the 1949 Gene-

pursue their economic, social and cultural development,

"*Reaffirming also* that all peoples have an inalienable right to complete freedom, the exercise of their sovereignty and the integrity of their national territory,

"*Considering* the necessity of furthering the study of all pertinent aspects of the situation with respect to the procedure for the implementation of resolution 1514 (XV) regarding Puerto Rico,

"*Recalling* its resolution of 28 August 1972 concerning Puerto Rico,

1. *Reaffirms* the inalienable right of the people of Puerto Rico to self-determination and independence in accordance with General Assembly resolution 1514(XV) of 14 December 1960;

2. *Requests* the Government of the United States of America to refrain from taking any measures which might obstruct the full and free exercise by the people of their inalienable right to self-determination and independence, as well as of their economic, social and other rights, and in particular to prevent any violation of these rights by bodies corporate under its jurisdiction;

3. *Requests* its Repporteur, with the assistance of the Secretariat, to collect all pertinent information on the question, including the views of all the parties concerned, for the purpose of facilitating its consideration of the question in 1974;

4. *Decides* to keep the question under continuous review."

The Court does not have to question in this case the authority of any international organization as to whether Puerto Rico is entitled to its independence in spite of a contrary expression by an overwhelming majority of the Puerto Ricans.

6. Only .006 favored independence and 38.98 cast their vote for statehood. It is interesting to note, by way of parenthesis, that the vote for independence, which up to that moment had been around five percent, dropped to less than one percent. This may be attributed to the fact that the "Partido Independentista Puertorriqueño" did not officially participate in the plebiscite. In the last general election in Puerto Rico the "Partido Independentista Puertorriqueño" improved its performance and polled 5.35% of the votes cast in favor of the candidate for governor, while the party as a whole obtained 4.37% of the said votes.

va Convention on civilian persons will show that the convention applies only in a state of war or belligerent occupation. For example, Article 49 speaks of individual or mass forcible transfer. The next to last paragraph of Article 49 speaks in terms "that the occupying power may not detain protected persons in an area particularly exposed to the dangers of war unless the security of the population or imperative military reasons so demand."

In conclusion, it is illusory to even hint that the accords of the 1949 Geneva Convention relative to the protection of civilian persons in time of war bar the application of the Selective Service Act of 1967 to defendants. In addition, we must point out that blanket acceptance of Article 47 of the Geneva Convention has a retroactive application *ad infinitum*, thus making void any manifestation of the express will of the people.

■ As to defendants' contention that in the light of the recent developments of the "Watergate affair," it would constitute an act of cruelty to criminally prosecute defendants for violation of the Selective Service Act, the Court is of the opinion that such a matter is totally unrelated and has no connection whatsoever to the issues involved in these cases. To accept defendants' proposal would be the equivalent of prohibiting the Department of Justice from initiating or carrying out all criminal prosecutions simply because of the existence of the so-called "Watergate Scandal". This would require, of course, that all United States Attorneys "close shop" and go home.

In closing, let us clarify for the record that on April 5, 1972 defendant Miguel González Vargas, (Cr.No. 62–72), informed the Court through his attorney, José Hamid Rivera, that a research team headed by Dr. Luis Nieves Falcón was planning a study of several aspects of the Federal Jury System in Puerto Rico. Pursuant to a petition filed by the defendant in Cr.No. 62–72, the Court, under the authority of Title 28, United States Code, Section 1867, subparagraphs (a), (d), and (f), issued an order permitting attorney José Hamid Rivera and Dr. Luis Nieves Falcón to inspect, reproduce and copy the contents of records and papers used by the jury commission in connection with the jury selection process in the District of Puerto Rico.

■ Through a motion dated April 17, 1972, defendant Miguel González Vargas informed the Court of the state of developments of the above mentioned study and anticipated that the same would take approximately four months to complete and requested a continuance in order to file a motion containing the challenge to the Federal Jury System in Puerto Rico. On December 27, 1972, defendants informed the Court, after the above cases had been consolidated, that although the study had not yet been completed, they expected to be through in a month and a half. Subsequent to that date and after an extension to file the results of the aforementioned study had been expired, defendants informed the Court of their impossibility of completing said study and requested that the motion for dismissal should be resolved by this Court on the basis of the record and the memoranda filed by the parties. Thus, although the issue of the composition of the jury in this District is not being considered here, the Court takes judicial notice that both the Grand Jury, and the Petit Jury at the present time is considerably more representative of a cross-section of the population in Puerto Rico than the Grand Jury and Petit Jury that the Court found not constitutionally objectionable in the case of *Amy Valentine, supra.*

### ORDER

For the foregoing reasons, it is ordered that all defendants' motions, and each of them be, and they are hereby, denied.